Argued and submitted September 22, affirmed November 18, 1998, petition for review denied March 23, 1999 (328 Or 366)

# THOMAS CREEK LUMBER & LOG CO.,
*Petitioner,*

*v.*

# STATE FORESTER,
*Respondent.*

## (96-341-94-03; CA A98920)

970 P2d 659

Joseph A. Yazbeck argued the cause for petitioner. With him on the briefs was Susan L. Bristow.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge,* and Wollheim, Judge.

LANDAU, P. J.

---

* Deits, C. J., *vice* Warren, J.

**LANDAU, P. J.**

This proceeding stems from a dispute over the provisions of a contract between the State Forester (Forester) and Thomas Creek Lumber and Log Company (Thomas Creek) for the sale of timber known as the "Spruce Goose combination," located near Astoria. Thomas Creek bid on the sale and was awarded the contract in 1994. In 1996, Thomas Creek failed to make a payment for the timber as required by the contract, and the Forester served Thomas Creek with a notice of default. Thomas Creek initiated this contested case proceeding, challenging the notice of default. The administrative law judge (ALJ) determined that Thomas Creek defaulted by failing to make the required payments under the timber sale contract and assessed damages of $347,628.53, and the Forester adopted those conclusions in its final order. Thomas Creek petitions for judicial review of that order. For the following reasons, we affirm.

In April 1994, the Department of Forestry (department) cruised for timber in the area of the Spruce Goose combination and estimated the volume of timber in the area as follows: 22,778 tons of Douglas fir; 25,408 tons of hemlock and other conifers; 3,501 tons of red alder and other hardwoods; and 150 cords of Western red cedar salvage. The Notice of Timber Sale (Notice) set forth those amounts and established the following bid requirements: $90.72 per ton for Douglas fir; $48.47 per ton for hemlock and other conifers; $22.82 per ton for red alder and other hardwoods; and a flat rate of $62,592.50 for the cedar salvage. The Notice stated that the "[t]otal contract price includes all species." The Notice further stated that the Forester "makes no guarantee as to the quantity, quality, or value of the timber to be sold[.]" Although the Forester generally entered into timber sale contracts based on size scaling, in this case, he determined that, because of the young age of many of the trees on the Spruce Goose combination, a weight sale would be an appropriate means of selling the timber. Thomas Creek submitted the only bid on the Spruce Goose combination, and its bid was accepted.

In May 1994, the parties entered into a contract for the sale of the timber. It provided for clearcutting 59 acres

and thinning 396 acres, to be completed by September 1996. Under the contract, payment for timber other than cedar salvage "shall be for log weight in tons." The contract and the instructions filed with local scaling bureaus indicated that the sales of timber other than cedar would be by weight and that mixed loads would be paid at the highest species rate. The relevant provisions of the contract include the following:

> "Section 1. Sale of Timber. Under the terms and conditions of this contract, STATE sells to PURCHASER, and PURCHASER buys from STATE, that Board of Forestry timber designated and described in Section 39, which for all purposes of this contract is hereinafter referred to as 'timber.' * * * PURCHASER shall pay STATE the 'purchase price for timber' set forth in Section 45. The purchase price shall be paid to STATE in accordance with the payment schedule in Section 43.

> "Section 2. Quality and Quantity of Timber. STATE makes no guarantee or warranty to PURCHASER as to the quality or quantity of the timber. PURCHASER shall be liable to STATE for the total purchase price even if the quantity or quality of timber actually cut, removed, or designated for taking is more or less than that estimated by STATE.

> "* * * * *

> "Section 39. Designated Timber. The timber is located on the timber sale area. * * *

> "In accordance with Section 1, the following is designated timber, except as excluded by Section 40, 'Reserved Timber.'[1]

> "All timber cut in accordance with the specifications in Section 56, 'Felling,' and Section 57, 'Thinning Specification,' within Areas I and II.[2]

> "All timber within Areas III, IV, V, VI, VII, and VIII.

> "All timber within Area IX R/W.

---

[1] The definition of reserved timber includes downed logs other than the cedar salvage, snags, red cedar, Sitka spruce, and marked boundary trees, and so forth. Thomas Creek makes no argument that the disputed undersized logs at issue here were "Reserved Timber" as defined in Section 40 of the contract.

[2] Thomas Creek does not dispute that the undersized logs at issue in this case were cut in accordance with the felling and thinning specifications set forth in Sections 56 and 57 of the contract.

"\* \* \* \* \*

"<u>Section 44. Payment Schedule.</u> The purchase price for timber sold under this contract shall be paid in advance as follows:

"\* \* \* \* \*

"Total purchase price shall be calculated after all log weight is reported by multiplying prices in Section 45 by total weight for each species plus the total price of the western red cedar. STATE shall refund any advance payment in excess of total price, or PURCHASER shall pay any deficit within 30 days of notice.

"\* \* \* \* \*

"<u>Section 45. Log Prices.</u> The following price schedule shall be designated as the contract value and shall apply for all designated timber. Payment shall be for log weight in tons. The price per ton shall be reduced by $18.10 for the first 7,000 tons of sawmill and better grades of Douglas-fir and $18.10 for the first 8,000 tons of sawmill and better grades of hemlock and other conifers. Logs to be removed are defined in Section 46.

"(a) Log prices shall be:

| "<u>Conifer Logs</u> | <u>Price per Ton</u> |
|---|---|
| "First 7,000 tons of Douglas-fir | $ 73.90 |
| "In excess of 7,000 tons of Douglas-fir | 92.00 |
| "First 8,000 tons of hemlock and other conifers | 30.90 |
| "In excess of 8,000 tons of hemlock and other conifers | 49.00 |
| "Western red cedar salvage TOTAL PRICE | 62,692.50 |

| "<u>Hardwood Logs</u> | <u>Price per Ton</u> |
|---|---|
| "Red alder and other hardwoods | $ 22.82 |

"(b) Other log prices shall be:

| "Special or Peelable Cull conifer logs | 27.43 |
|---|---|

"\* \* \* \* \*

"Section 46. Log Removal. All logs defined below, except those specified in Section 40, 'Reserved Timber,' shall be removed as designated timber under this contract, at prices given in Section 45(a):

"(a)   Any conifer log that conforms with grading rules for peeler or sawmill grades and meets or exceeds both of the following minimum requirements: 6 inches in gross scaling diameter, containing more than 20 board feet (net).

"(b)   Any hardwood log that conforms with grading rules for No. 4 Alder log grade or better and meets or exceeds both of the following minimum requirements: 6 inches in gross scaling diameter, containing 20 board feet (net).

"Other logs may be removed from designated timber under the contract prices given in Section 45(b)."

Thomas Creek subcontracted with loggers who began removing the timber in mid-1994. The logs removed from the site were branded with an "H5" brand. In early 1995, Brent Walker, of Thomas Creek, spoke with Dan Goody, who had been assigned to administer the contract for the Forester. Walker said that he wanted to remove undersized logs from the site at a reduced rate of about $20 per ton for use at Thomas Creek's chip mill. By that point, some loads had been removed from the site that contained undersized logs, and those loads had been billed by weight. Goody refused Walker's request. Walker then took the position that Thomas Creek was not required to pay for the undersized logs and could remove them without any payment at all. Goody responded that all timber removed was to be paid by weight. At various points throughout the performance of the contract, Thomas Creek brought to the Department's attention billing errors and questions, and those issues were resolved. Thomas Creek did not, however, object to the weight-based billings on the ground that some loads contained undersized logs for which they should not be billed.[3]

---

[3] In a deposition, Thomas Creek's bookkeeper, who contacted the department about billing questions and disputes on a monthly basis, testified that she did not pursue this subject during the course of the sale because Walker intended to deal with this issue at the end of the sale, as they believed that Thomas Creek would not be permitted to continue logging if the issue was raised while logging was still under way.

Goody later agreed that certain "clean up" mixed loads—the last loads to be removed from certain areas—could be scaled rather than weighed. In August 1995, Goody agreed to a modification of the contract allowing Thomas Creek to remove undersized logs without charge, subject to certain conditions: that the undersized logs be marked with an "A" brand and inspected before removal, that all "H5" logs be removed from an area before the "A" materials are inspected, and that Goody receive 48 hours' notice prior to his inspection of the "A" materials. Of approximately 2,000 loads removed from the site, at least 93 loads were "A" brand materials for which Thomas Creek was not billed. In October 1995, several loads of "A" brand materials were mislabeled "H5" due to logger error and were billed, but this error was corrected. Some of the "A" brand logs were placed in loads with the other logs and billed by weight, in accordance with the contract. As noted above, Thomas Creek made no objection to this at the time of billing. Thomas Creek alleged in this proceeding that it hauled "A" brand logs with "H5" brand logs because Goody did not inspect the "A" brand loads often enough.

In January 1996, Goody was asked by his superiors to investigate the option of changing the contract to a size scaling contract rather than a weight contract. Goody suggested this idea to Walker, but Walker made no response. The Forester billed Thomas Creek for the 90 percent payment due under the contract on August 1, 1996, and Walker requested an extension until October 1996. The Forester denied the extension. Thomas Creek completed all of the logging that it intended to do on August 3, 1996, leaving unharvested approximately 2,000 tons of material.[4] Thomas Creek did not make the August payment, and, as a result, the Forester issued a notice of suspension on August 13, 1996.

Thomas Creek initiated this contested case proceeding, alleging that it was not in default because the Forester breached the contract by overbilling Thomas Creek.[5]

---

[4] The Forester's estimate of the tonnage of timber, other than the cedar salvage, in its Notice of Timber Sale was 51,687 tons. The record reveals that Thomas Creek removed approximately 51,250 tons from the site, exclusive of the cedar salvage.

[5] The Forester acts as chief executive officer of the State Department of Forestry and enters into timber sale contracts on its behalf. ORS 526.031; ORS

Thomas Creek also alleged that it was entitled to recoupment of $212,646.94 against the Forester's claimed damages, on the ground that the Forester had overbilled Thomas Creek that amount during the course of the sale. Thomas Creek claimed that the contract allowed it to remove undersized logs for free and that the Forester breached the contract by billing by weight for the loads that contained undersized logs. Thomas Creek claimed that the billing needed to be recalculated based on the size-based scaling information that it had maintained for its customers, in order to ensure that it paid for no undersized logs.

The Forester took the position that the contract required payment for all logs removed by Thomas Creek except those removed from the site pursuant to the modification that allowed removal of "A" brand logs after the "H5" logs had been removed from each area. The Forester further contended that Thomas Creek was not entitled to any offset or recoupment.

The ALJ found the contract to be unambiguous and concluded that Thomas Creek was in default for failing to make the required payments. The ALJ concluded that Thomas Creek was not entitled to any offset or recoupment, based on the fact that it had removed numerous undersized logs from the site by methods other than the approved "A" brand removal process and had been billed for those logs at the prices set forth in Section 45 of the contract. The ALJ further concluded that Thomas Creek was not entitled to an offset or recoupment because of the Forester's underestimation of the amount of red cedar salvage. The ALJ reasoned that "[t]he * * * valuation of the cedar, as compared to the entire contract price, is less than two percent of the contract. An error of less than two percent on the value of the entire timber sale is to be expected in a timber contract."

On appeal, Thomas Creek makes three assignments of error. First, Thomas Creek asserts that the ALJ erred in holding that the contract required it to pay for undersized

---

530.050. Pursuant to OAR 629-032-0050, a party to a timber sale contract who has received a notice of default from the Forester may request a contested case hearing before the Forester. The Forester's order may be appealed pursuant to ORS 183.482.

logs that it removed from the site in a manner not approved by the "A" brand modification. Second, Thomas Creek asserts that the ALJ erred in rejecting its recoupment defense. Third, Thomas Creek asserts that the ALJ erred in finding that the Forester was not negligent in estimating the amount of cedar salvage in the sale area.

We begin with Thomas Creek's contentions concerning the proper construction of the contract. Thomas Creek asserts that the contract called for payment only of "designated timber" and that the only "designated timber" under the contract is that defined in Section 46(a) and (b), *i.e.,* logs that are "6 inches in gross scaling diameter, containing 20 board feet (net)." Thomas Creek argues that the Forester's modification to allow "A" brand undersized logs to be removed without charge constitutes an admission that the contract did not require Thomas Creek to pay for any undersized logs removed from the site. Alternatively, Thomas Creek suggests that, if the contract is ambiguous, Sections 45 and 46 should "control" over inconsistent provisions in Sections 1 and 39.

■■ Whether a contract is ambiguous is a question of law and is determined by reference to the contract itself:

> "When considering a written contractual provision, the court's first inquiry is what the words of the contract say * * *. To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question. The meaning of disputed text in that context is then determined. In making that determination, the court inquires whether the provision at issue is ambiguous. Whether the terms of a contract are ambiguous is a question of law. In the absence of an ambiguity, the court construes the words of a contract as a matter of law."

*Yogman v. Parrott,* 325 Or 358, 361, 937 P2d 1019 (1997), *quoting Eagle Industries, Inc. v. Thompson,* 321 Or 398, 900 P2d 475 (1995). An ambiguity exists if the disputed terms lend themselves to more than one reasonable interpretation. *Id.* at 363-64.

Looking to the four corners of the contract, we agree with the ALJ that there is only one reasonable interpretation

of the relevant provisions and that the contract thus is unambiguous. Section 1 provides that Thomas Creek will pay the purchase price in Section 45 for "designated timber" as described in Section 39. Section 39 defines "designated timber" as *all* timber in certain areas and *all* timber that is cut according to felling and thinning specifications in other areas, with the exception of "reserved timber," defined in Section 40. The disputed timber in this case was cut according to felling and thinning specifications and does not meet the definition of "reserved timber." Section 44 indicates that the total price will be calculated according to the prices in Section 45 "after *all* log weight is reported[.]" Section 45 sets forth prices that "shall apply to *all* designated timber." Section 46 provides that designated timber that is "6 inches in gross scaling diameter, containing more than 20 board feet (net)" "*shall* be removed" under the contract and that "[o]ther logs may be removed from designated timber under the contract prices shown in Section 45(b)." (Emphasis added.)

■ ■    Those provisions, when read together, cannot be interpreted to mean that only logs that are "6 inches in gross scaling diameter, containing more than 20 board feet (net)" are designated timber that must be paid for when removed and that the purchaser is not required to pay for any timber that it removes that does not meet those specifications. To interpret the contract in such a manner would give no effect to the definition of "designated timber" found in Section 39. We do not construe contracts in a manner that renders a portion of the contract meaningless. *Becker v. North's Restaurants, Inc.,* 157 Or App 136, 967 P2d 1246 (1998). The unambiguous meaning of the contract is that the purchaser is *required* under Section 46 to remove any designated timber that is "6 inches in gross scaling diameter, containing more than 20 board feet (net)" and that it *may* remove other designated timber. In either event, designated timber that is removed by the purchaser is to be paid for under one of the prices listed in Section 45. Moreover, this interpretation of the contract is consistent with the provision that, for other than the cedar salvage, the sale was based on the weight of logs removed and not on their scaling diameter. It defies reason that a party could enter into a weight sale contract, load logs of various sizes onto a truck, have those logs weighed

pursuant to the contract for billing purposes, then expect to have the purchase price adjusted downward by means not specified in the contract based on scale sizing data that was not even contemplated by the contract.

■     We also reject Thomas Creek's assertion that the Forester's modification of the contract in August 1995 to allow removal of "A" brand logs without charge constituted any sort of admission. While the modification certainly would preclude the Forester from charging Thomas Creek for "A" brand material removed from the site pursuant to the modification, it reveals nothing about the meaning of the above-quoted sections of the contract as applied to logs that were not removed pursuant to that modification.

The ALJ correctly determined that the contract was unambiguous and that the Forester did not breach it by billing Thomas Creek for designated timber removed from the site other than the timber required to be removed under Section 46(a) and (b). Therefore, the ALJ also correctly concluded that Thomas Creek was in default for failing to make its required payment under the contract on August 1, 1996.

■     We next address Thomas Creek's assertion that it is entitled to recoupment because it provided "adequate notice of its rejection of the nonmerchantable logs." Under ORS 72.6070, a provision of the Uniform Commercial Code relating to the sale of goods:

"(1)   The buyer must pay at the contract rate for any goods accepted.

"(2)   Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by ORS 72.1010 to ORS 72.7250 for nonconformity.

"(3)   Where a tender has been accepted:

"(a)   The buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach or be barred from any remedy * * *.

"* * * * *

"(4)   The burden is on the buyer to establish any breach with respect to the goods accepted."

Citing *Oregon Lbr. v. Dwyer Overseas Timber Products,* 280 Or 437, 442, 571 P2d 884 (1977), Thomas Creek contends that "notification" under ORS 72.6070(3)(a) "need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." Thomas Creek asserts that its seeking a lower price on the undersized materials, as well as its notification concerning various billing problems in the course of the sale that are unrelated to the current dispute, were sufficient to notify the Forester that "the transaction [was] still troublesome." We disagree with Thomas Creek's analysis for several reasons.

■       First, as noted above, we do not agree with Thomas Creek's premise that the Forester breached the contract by billing for designated timber that was not "6 inches in gross scaling diameter, containing more than 20 board feet (net)." Moreover, Thomas Creek *accepted* the undersized logs by hauling them to its chip mill and using them. Finally, Walker chose not to challenge the monthly billings for the undersized logs, despite the parties' regular resolution of billing problems during the course of the contract, because he did not want the Forester to suspend the logging operation. Choosing to wait until the very end of a multiple-year contract to raise a claim that the seller has been breaching the contract for years by overbilling cannot be deemed a notification "within a reasonable time after the buyer discovers or should have discovered any breach[.]" ORS 72.6070(3)(a).

*Dwyer* does not further Thomas Creek's argument. In that case, the buyer complained about the quality of the lumber within one or two weeks of receiving it and refused to pay full price for it, on the ground that it was not running to the expected grade. 280 Or at 440-41. Within several days of the shipment, the seller "had received some complaints that the lumber was not grading out as anticipated[.]" *Id.* at 443. The court went on to note that even if the seller was not deemed to have received notice at that point, the refusal to pay several weeks after the shipment also "would not constitute an unreasonable delay in notification" for purposes of ORS 72.6070(3)(a), because the seller "was notified of defects

within one month from the date that the first batch of the large shipment of lumber was processed through the Buyer's dry kiln[.]" *Id.* at 443-44. In contrast, in this case, the buyer hauled away the undersized logs over the course of two years, knowing that it wanted them for its chip mill, knowing that it would be billed for them at the contract price, and not under any mistaken belief that those logs were "6 inches in gross scaling diameter, containing more than 20 board feet (net)." The buyer withheld notice that it was going to refuse to pay for the goods until it had acquired all of those goods. The ALJ correctly concluded that Thomas Creek's failure to provide adequate and timely notice of the alleged billing errors under ORS 72.6070(3)(a) would preclude any offset or recoupment defense.

■   That leaves Thomas Creek's final assignment of error, in which it claims that the ALJ erred in determining that the Forester was not negligent in estimating the amount of red cedar salvage under the contract. It is not clear whether Thomas Creek is claiming that that alleged negligence excuses it from performing the payment terms of the contract, or if it is claiming that it is entitled to some adjustment of the contract price because it recovered less than the amount of cedar salvage estimated in the notice and the contract. In either case—and leaving aside the fact that both the notice and the contract specifically disclaimed any guarantee of the quantity of the timber available—Thomas Creek's position is untenable. Thomas Creek asserts that, because the cedar price in the contract was a lump sum while the other species were sold on a weight basis, the cedar provisions are severable and should be viewed separately from the remainder of the contract. If Thomas Creek is correct that those provisions are severable and should be viewed separately, then it is difficult to understand how they might justify Thomas Creek's refusal to pay for the timber *other than* the cedar that was billed by weight, or its claim to be entitled to recoupment in the amount of $212,646.94, given that the total price for the cedar salvage under the contract was only $62,692.50. If, on the other hand, the cedar provisions are not viewed separately, we cannot take issue with the ALJ's conclusion that "[t]he * * * valuation of the cedar, as compared to the entire contract price, is less than two percent of the contract. An

error of less than two percent on the value of the entire timber sale is to be expected in a timber contract."

Affirmed.