Argued and submitted June 14, reversed and remanded in part; otherwise affirmed
November 3, 1999, petition for review denied February 8, 2000 (329 Or 650)

Ellen VARNER,
*Appellant,*

*v.*

S. David EVES,
*Respondent.*

(16-97-01268; CA A102273)

990 P2d 357

Megan L. Harris argued the cause for appellant. With her on the briefs were Matthew W. Derby and The Law Offices of Danny Lang & Associates.

Richard A. Roseta argued the cause for respondent. On the brief were Charles D. Carlson and Brown, Roseta, Long, McConville, Kilcullen & Carlson.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

## BREWER, J.

In this breach of contract and professional negligence action, plaintiff appeals from summary judgment in favor of defendant—an attorney who represented plaintiff in an earlier medical malpractice action against a physician. Plaintiff argues that the trial court erred in granting summary judgment, because the evidence, when viewed in the light most favorable to plaintiff, created genuine issues of material fact that defendant breached an oral promise to file a complaint against the physician by a specific date and that defendant negligently represented plaintiff. We affirm with respect to the contract claim and reverse and remand with respect to the first specification of the negligence claim.

In November 1990, plaintiff underwent radial keratotomy surgery on both eyes to correct her nearsightedness. Dr. O'Dell of the Northwest Eye Center (Center) performed the surgery. After the surgery, plaintiff experienced pain in her eyes and could not focus her vision without the aid of glasses. Plaintiff also suffered from "starburst" problems, excessive tearing and variable vision. As a result, plaintiff asked Dr. MacRae of the Casey Eye Institute at Oregon Health Sciences University to examine and evaluate her condition. MacRae diagnosed that the surgery had caused an overcorrection of plaintiff's vision. He recommended that plaintiff wear glasses to correct her vision and not undergo further surgery. Plaintiff then returned to the Center where she received several follow-up opinions recommending that she undergo hexagonal keratotomy surgery to eliminate the overcorrection. Plaintiff opted for the surgical remedy rather than glasses and had nine additional surgeries performed by O'Dell and his staff between April 1991 and October 1993. Each surgery sought unsuccessfully to eliminate the initial overcorrection. Finally, in May 1994, the Center staff told plaintiff that there was nothing more the Center could do for her. At that time, her uncorrected vision was 20/70 in her right eye and 20/30 in her left eye, and plaintiff continued to have pain in her eyes and to suffer from "starburst" problems, excessive tearing and variable vision.

On February 7, 1995, four-and-a-half years after the first surgery, plaintiff consulted defendant about pursuing a medical malpractice claim against O'Dell. During that meeting, plaintiff told defendant about her surgeries and the resulting problems. She related the dates of the surgeries, including the 1993 surgeries, which took place on March 5, July 30, and October 27. Defendant agreed to represent plaintiff but indicated that he was concerned about the statute of limitations and, thus, stated that his goal was to file the complaint by March 5, 1995—the two-year anniversary of the third-to-last surgery. Plaintiff and defendant then executed a contingent fee agreement (fee agreement), and plaintiff signed medical releases enabling defendant to request her medical records. Two days later, defendant requested plaintiff's medical records from O'Dell. Defendant also requested MacRae's records. On February 22, defendant received MacRae's medical records, which appeared to verify plaintiff's claim that her conditions were triggered by the initial surgery in 1990. On February 24, defendant wrote to plaintiff and told her that he had received MacRae's records but had not yet received O'Dell's records. In that letter, defendant reaffirmed that he was anxious to file the claim by March 5, but stated that he needed O'Dell's records in order to determine plaintiff's damages and that he would not file the complaint until he had received the records. Over the next two months, defendant continued to request O'Dell's records without success, and, ultimately, defendant filed the complaint in mid-April in an effort to compel the production of O'Dell's records through discovery. That filing also constituted a notice of claim to O'Dell's insurer.[1]

In late July 1995, O'Dell filed a voluntary petition for bankruptcy under the United States Bankruptcy Code. That filing resulted in an automatic stay of plaintiff's medical malpractice claim against O'Dell. Defendant petitioned the bankruptcy court to grant relief from the automatic stay. The court granted relief to the extent of O'Dell's insurance coverage. However, O'Dell's "claims made" insurance policy had

---

[1] Under O'Dell's errors and omissions policy, a "claim" is defined as "a written notice or demand for damages signed by or on behalf of one alleged to have been damaged as a result of a medical incident asserting that [the insured doctor is] liable for said damage. *Claim also includes a suit*." (Emphasis added.)

been canceled effective March 10, 1995.[2] In light of the limited relief from the bankruptcy stay and the probable lack of insurance coverage, defendant advised plaintiff against pursuing her claim further. Defendant then filed a motion to withdraw from representing plaintiff and also moved for a continuance of the scheduled trial date. The trial court granted the motion to withdraw and reset the trial date. Plaintiff later secured a second continuance of the trial date. On the date set for trial, plaintiff appeared in court unrepresented, explained that she had difficulty finding representation and sought to voluntarily dismiss the claim. The trial court offered to reset the case for a later date so that plaintiff could find an attorney, but she declined. The trial court explained to plaintiff that her case would be dismissed with prejudice and explained the legal significance of such a dismissal. Following that explanation, plaintiff again requested that her case be dismissed. The court then entered judgment dismissing plaintiff's case with prejudice. This litigation followed.

■■ In her complaint, plaintiff alleged that defendant negligently represented her and that defendant breached an oral promise to file plaintiff's claim against O'Dell by March 5, 1995. Defendant moved for, and the trial court granted, summary judgment on both claims. Plaintiff appeals from that judgment and asserts that the trial court erred, because the evidence established genuine issues of material fact with respect to each claim. We assess the evidence produced at summary judgment in the light most favorable to the non-moving party in order to determine whether a genuine issue of material fact exists and, if not, whether the moving party was entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 413, 939 P2d 608 (1997). No genuine issue of material fact exists—and summary judgment is appropriate—if no objectively reasonable juror could return a verdict for the nonmoving party. *Id.* at 414.

---

[2] O'Dell's policy provided coverage for only "those claims that are first made against the insured and first presented to [the insurer] in writing *during the policy term*." (Emphasis added.)

On appeal, plaintiff first asserts that the trial court improperly granted summary judgment on the contract claim because plaintiff's affidavit, together with defendant's deposition testimony, established that defendant orally promised to file a claim against O'Dell by March 5, 1995.[3] Based on that evidence, plaintiff argues that "at the time of the formation of the [fee agreement]" the parties intended that defendant would file plaintiff's claim no later than March 5, 1995, and that defendant's failure to do so supports a claim for breach of contract. Defendant contends that he and plaintiff intended the fee agreement to be the final expression of his contractual duties regarding his representation of plaintiff, and, therefore, the parol evidence rule bars plaintiff's evidence because it is inconsistent with an express term of the fee agreement. Defendant relies on the following portion of the fee agreement:

"In the event that after investigation of the law or facts, or either of them, the attorney is of the opinion that the claim should not be prosecuted further, he shall be allowed to resign this employment upon giving reasonable notice to the client(s)."

Plaintiff asserts that the parol evidence rule is not triggered, because the fee agreement was not integrated. Alternatively, plaintiff asserts that the oral promise was not inconsistent with the fee agreement and, thus, evidence of the promise is admissible.[4]

---

[3] Plaintiff's affidavit provided, in part:

"By [defendant's] own statements made to me that day at his office on February 7, 1995, I understood that he had agreed/promised me that he would take all necessary immediate action to see that my case/claim was filed before that March 5, 1995 deadline. His exact words spoken to me were that 'I am going to get this on file by the March 5, 1995 deadline.' At that point * * *, [defendant] pulled out his Contingent Fee Agreement and he and I both signed it at that time."

At defendant's deposition, plaintiff's counsel asked, "Did you make any representations to her that you planned to file a complaint prior to March 5th, 1995?" Defendant answered, "I believe I told her that that was certainly an objective of mine."

[4] We reject plaintiff's contention that the fee agreement was ambiguous because, beyond a general argument that the agreement made "no sense," plaintiff does not argue that the disputed provision lends itself to more than one reasonable interpretation. See *Thomas Creek Lumber & Log Co. v. State Forester*, 157 Or App 204, 212, 970 P2d 659 (1998), *rev den* 328 Or 366 (1999) (ambiguity exists if disputed terms lend themselves to more than one reasonable interpretation).

■ ■ In order to promote commercial certainty between contracting parties, the parol evidence rule excludes certain extrinsic evidence proffered to supplement or contradict a written *integrated* agreement—that is, a writing intended to be the final expression of some or all of the terms of the agreement. *Abercrombie v. Hayden Corp.*, 320 Or 279, 286-87, 883 P2d 845 (1994).[5] Plaintiff contends that the fee agreement was not integrated because it did not contain an integration clause and because defendant was an experienced attorney, an occupation that plaintiff asserts inherently put defendant in a position of stronger bargaining power. While both contentions are relevant in establishing whether the parties intended the fee agreement to be the final expression of their agreement, neither conclusively verifies the parties' intent. *See Hatley v. Stafford*, 284 Or 523, 534, 588 P2d 603 (1978) (representation by counsel is relevant); *see also State v. Triad Mechanical, Inc.*, 144 Or App 106, 117, 925 P2d 918, *rev den* 324 Or 488 (1996) (absence of integration clause not dispositive). Other factors also inform our inquiry.

■■■ First, there is no evidence that this was not an arm's-length transaction—*i.e.*, plaintiff presumably could have retained other counsel if she found the terms of the fee agreement unacceptable. Second, the fee agreement was typewritten and signed by both parties, and, thus, it appears complete with respect to the terms included in the writing. *See Hatley*, 284 Or at 535 (apparently complete writings presumed to be integrated). Finally, neither party contends that the fee agreement is not final as to its terms; instead, they only disagree about the meaning of the terms. *Abercrombie*, 320 Or at 288. For those reasons, we conclude that the parties intended the fee agreement to be the final expression of the terms incorporated in the writing—*i.e.*, we conclude that the fee agreement is at least partially integrated.[6] We next decide whether the oral promise was inconsistent with the

---

[5] The parol evidence rule is enacted in ORS 41.470. That statute is nothing more than a codification of the common-law parol evidence rule. *Id.* at 286.

[6] We need not decide whether the fee agreement was a *complete* integration. A complete integration is a writing that the parties have intended to be the "final *and* exclusive expression of their agreement"; such agreements bar prior or contemporaneous extrinsic evidence within the scope of the agreement whether or not it is consistent with the agreement. *Id.* at 287-88 (emphasis in original).

fee agreement; if so, it is barred from consideration by the parol evidence rule. *Id.* at 289.

 A prior agreement is "inconsistent" with the terms of an integrated writing if it contradicts or negates an express term in the writing. *Id.* Defendant asserts that the alleged oral promise is inconsistent with the fee agreement to the extent the promise would obligate defendant to file the claim by March 5, 1995, when he "is of the opinion that the claim should not be prosecuted further." Plaintiff contends that the promise is not inconsistent but rather only "adds 'how' the claim will be prosecuted." We agree with defendant that the alleged promise is inconsistent with the fee agreement. That alleged promise would require defendant to meet the March 5 deadline regardless of his opinion about the claim's legal merit. The alleged promise is inconsistent with the fee agreement because it would negate defendant's contractual rights to investigate plaintiff's claim and to withdraw from representation should he determine that the claim lacked merit. Therefore, the parol evidence rule bars admission of the alleged oral promise, and the trial court appropriately granted summary judgment on plaintiff's breach of contract claim.[7] We next turn to plaintiff's professional negligence claim.

 In a professional negligence case, the plaintiff must allege and prove "(1) a *duty* that runs from the defendant to the plaintiff; (2) a *breach* of that duty; (3) a resulting *harm* to the plaintiff measurable in damages; and (4) *causation, i.e.,* a causal link between the breach of duty and the harm." *Stevens v. Bispham,* 316 Or 221, 227, 851 P2d 556 (1993) (emphasis in original). With respect to the fourth element, when an attorney's negligence occurs in the conduct of litigation, the plaintiff must prove that the attorney's negligence *caused* a less favorable outcome in the underlying case *i.e.,* the "case within the case." *See Chocktoot v. Smith,* 280 Or 567, 570, 571 P2d 1255 (1977); *see also Harding v. Bell,* 265 Or 202, 205, 508 P2d 216 (1973).

---

[7] Because we conclude that the parol evidence rule bars admission of extrinsic evidence of the alleged promise to file the claim by March 5, 1995, we do not discuss defendant's other arguments regarding the contract claim.

Here, plaintiff alleged in her complaint that defendant was negligent in: (1) failing to give timely "notice of claim" to O'Dell's insurance carrier; (2) failing to timely file and prepare the valid lawsuit; (3) misrepresenting to plaintiff that defendant would take immediate action to preserve all of plaintiff's rights against O'Dell; and (4) withdrawing without determining whether pursuing the claim against O'Dell was futile. Plaintiff claimed that such negligence harmed her because it caused plaintiff to lose her "ability to obtain a judgment collectible against [O'Dell] and/or his malpractice insurance carrier." Plaintiff also alleged a fifth specification of negligence, namely, that defendant negligently failed to warn plaintiff that defendant's withdrawal would leave plaintiff to resolve the lawsuit without counsel, thereby exposing plaintiff to a judgment for costs in favor of O'Dell. At summary judgment and on appeal, defendant has argued that plaintiff's negligence claim is barred as a matter of law, because plaintiff is precluded from proving her claim against O'Dell. Alternatively, defendant asserts that he did not breach a legally recognized duty toward plaintiff. We address each argument in turn.

Defendant contends that plaintiff cannot prove her claim against O'Dell—the "case within the case"—for two reasons. First, defendant asserts that plaintiff's claim against O'Dell was barred by the statute of limitations at the time defendant agreed to represent plaintiff. Second, defendant argues that claim and issue preclusion bar plaintiff from proving that O'Dell was negligent in this case. We disagree and will address defendant's arguments in reverse order.

■ Claim preclusion bars all subsequent claims by plaintiff against O'Dell, and those with whom he is in privity, that arise from the same factual transaction at issue in the underlying medical malpractice action and that could have been joined in that action. *Rennie v. Freeway Transport*, 294 Or 319, 323-24, 656 P2d 919 (1982). Defendant was not in privity with O'Dell nor could defendant have been joined in the underlying action, because plaintiff's claim against him did not arise out of the same factual transaction that triggered plaintiff's medical malpractice claim against O'Dell. *See* ORCP 28 A (defendants may be joined in one action if right to relief arises out of same transaction, occurrence, or

series of transactions). Instead, plaintiff's claim against defendant arose out of and was triggered by defendant's representation of plaintiff, a factual transaction that was independent of O'Dell's alleged negligence. Thus, claim preclusion does not bar litigation of O'Dell's negligence in this case.

Issue preclusion bars litigation of O'Dell's negligence *only if* that issue was " 'actually litigated and determined' in a setting where 'its determination was essential to' the final decision reached." *Drews v. EBI Companies*, 310 Or 134, 139, 795 P2d 531 (1990). Plaintiff's dismissal did not necessarily litigate and determine O'Dell's liability, and issue preclusion does not bar that determination here.

However, by requesting dismissal, plaintiff did abandon two of her allegations to the effect that defendant's negligence *caused* her harm, and she is now precluded from asserting otherwise. First, defendant's alleged failure to warn that his withdrawal would leave plaintiff to resolve the case without counsel did not cause plaintiff harm, because she requested dismissal despite the trial court's express offer to reset the trial date so that plaintiff could obtain other counsel. Second, plaintiff also abandoned her allegation that defendant negligently withdrew without determining whether the claim against O'Dell was futile, because her dismissal effectively conceded that pursuing the claim further was pointless. Thus, plaintiff's fourth and fifth specifications of negligence cannot be proven, and summary judgment on those specifications was appropriate.

Plaintiff's dismissal of her claim against O'Dell also limits the scope of plaintiff's remaining negligence specifications because, by seeking dismissal, plaintiff abandoned her allegation that those specifications caused her to lose her ability to obtain a judgment enforceable against O'Dell's personal assets. In other words, plaintiff implicitly conceded that O'Dell's intervening bankruptcy prevented her from recovering a judgment against O'Dell from any asset other than insurance proceeds. Defendant harmed plaintiff, if at all, only to the extent his actions negligently caused plaintiff to lose a judgment that would have been covered by O'Dell's malpractice insurance policy. *See Ridenour v. Lewis*, 121 Or

App 416, 419, 854 P2d 1005, *rev den* 317 Or 583 (1993) (plaintiff suffers no harm unless lost judgment had value). Accordingly, only plaintiff's first specification of negligence may survive summary judgment in this case because, in addition to proving her claim against O'Dell, she may only prevail against defendant if she proves that his negligence caused the loss of recourse to O'Dell's malpractice insurance coverage. For that reason, we next consider whether the statute of limitations barred plaintiff's negligence claim against O'Dell, and, if not, whether defendant breached a legal duty in failing to file a "timely" notice of claim with O'Dell's insurance carrier.

 An action to recover damages arising from medical treatment must be commenced within two years from the date when the plaintiff discovers or should have reasonably discovered a claim. ORS 12.110(4). *FDIC v. Smith*, 328 Or 420, 428, 980 P2d 141 (1999). Under that rule, the plaintiff "must have a reasonable opportunity to become aware of * * *: (1) harm; (2) causation; and (3) tortious conduct" before the statute of limitations will begin to run. *Id.* (citing *Gaston v. Parsons*, 318 Or 247, 256, 864 P2d 1319 (1994)). Thus, the relevant inquiry is determining when plaintiff knew or should have known that her eye problems were caused by O'Dell's negligence. That determination is one of fact that cannot be resolved on summary judgment, unless, as a matter of law, plaintiff should have discovered the claim by a date that preceded the filing of the action by more than two years. *Gannon v. Rogue Valley Medical Center*, 92 Or App 314, 316-17, 758 P2d 87, *rev den* 307 Or 145 (1988).

Defendant argues that plaintiff knew or should have known that she had a claim after the 1990 surgery because plaintiff admitted in her deposition that all of her problems — the "starburst" effect, excessive tearing and variable vision — were present after that surgery and because MacRae diagnosed that the surgery resulted in an overcorrection and advised against further surgery. In response, plaintiff contends that statements from O'Dell and the Center staff after the 1990 surgery prevented her from "discovering" that she had been injured until she was informed by the Center's staff, in May 1994, that nothing more could be done.

Plaintiff's affidavit opposing summary judgment averred that:

"When I returned to the [Center] * * * *O'Dell reassured me* that he could solve the over correction problem by telling me that he could improve my vision by 'fine tuning' getting me back in for another surgery and that it was *not a problem* because the follow-up surgeries would be a matter of a few additional cuts/incisions to take care of the initial over correction that had occurred.

"I also consulted with other opthamologists/physicians associated with the [Center]. All of those physicians, and the [Center] professional staff reassured me that the over correction *'was not a problem'* and that *'Dr. O'Dell could take care of it.'* " (Emphasis added.)

Plaintiff also submitted O'Dell's deposition testimony wherein he testified that it was common for patients to return as many as nine times to remedy an overcorrection. A Center brochure given to plaintiff after the 1990 surgery corroborated O'Dell's testimony. The brochure stated that some patients need a "secondary 'enhancement' surgery" to remedy remaining problems. Viewing that evidence in the light most favorable to plaintiff, an objectively reasonable juror might conclude that plaintiff could not have reasonably "discovered" that she was harmed by O'Dell's alleged negligence until she was told by the Center staff, in May 1994, that she could not be helped further. Accordingly, defendant was not entitled to summary judgment based on the statute of limitations defense. We therefore determine whether defendant breached any legally recognized duty to plaintiff by failing to file a "notice of claim" with O'Dell's insurance carrier before the policy was canceled.

▮▮▮▮ In an attorney-client relationship, the law imposes a duty of care on the attorney to "act as a reasonably competent attorney in protecting and defending the interests of the client." *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 160, 843 P2d 890 (1992). Neither party disputes that defendant owed that duty to plaintiff; instead, they disagree as to scope of the duty. Plaintiff argues that it was within the scope of defendant's professional duty to promptly give notice of the

claim to O'Dell's insurance carrier. On the other hand, defendant asserts that such an expectation exceeded the scope of his duty *as a matter of law*.

 The scope of the duty created by the attorney-client relationship is developed on a case-by-case basis. *Id.* at 159. In defining the scope of that duty, it is appropriate to look to "[c]ommon law principles of reasonable care and foreseeability of harm." *Allstate Ins. Co. v. Tenant Screening Services, Inc.*, 140 Or App 41, 50, 914 P2d 16 (1996). The jury must decide whether the defendant's conduct fell short of the professional standard, unless the evidence is such that no reasonable person could differ as to the defendant's professional obligation. *Chocktoot*, 280 Or at 572.

 To support her argument that defendant was required to give O'Dell's insurance carrier "timely" notice of claim, plaintiff submitted an affidavit from her attorney as allowed under ORCP 47 E. That affidavit stated that

> "[plaintiff had] retained unnamed expert witness who [was] ready, willing and available to testify to admissible facts and opinions creating genuine issues of material fact as to the issues raised by [defendant's] Motion for Summary Judgment including the standard of care, the duty of [d]efendant, the breach of duty by [d]efendant, and the causation of damages, which, if revealed by Affidavit would be a sufficient basis for denying Summary Judgment."

The facts about which an unnamed expert may testify include those appearing in the summary judgment record, as well as those facts relied on by the expert that are not disclosed in the summary judgment proceeding. *Compare* ORCP 47 C (facts must be on record before court at summary judgment) *with* ORCP 47 E (affidavit based on "admissible facts or opinions * * * which, *if revealed by affidavit*," would provide a basis for denying summary judgment).

Here, plaintiff submitted portions of defendant's deposition testimony wherein defendant acknowledged that he was an experienced malpractice attorney, that he had successfully litigated several malpractice cases against O'Dell, and that he knew O'Dell was the defendant in several other malpractice claims. Based on those and other facts that plaintiff was permitted to withhold under ORCP 47 E, an

expert might testify, for example, that defendant should have known that O'Dell had "claims made" coverage, which could be preserved, for purposes of plaintiff's claim, by providing a prelitigation notice of claim to O'Dell's carrier. The expert might also testify that, under the circumstances, defendant's failure to promptly provide such notice breached his duty of care to plaintiff. Therefore, the trial court erred in granting summary judgment in favor of defendant on plaintiff's first specification of negligence.[8] *See generally Stotler v. MTD Products, Inc.*, 149 Or App 405, 943 P2d 220 (1997).

Summary judgment on plaintiff's first specification of negligence reversed and remanded; otherwise affirmed.

---

[8] Although ORCP 47 E refers to an expert retained by counsel, we reject defendant's argument that the affidavit is legally insufficient because it stated that plaintiff—rather than her attorney—retained the expert. *See Sisters of St. Joseph v. Wyllie*, 120 Or App 474, 478, 852 P2d 941 (1993) (medical malpractice claimant's testimony that "I have an expert witness" satisfies ORCP 47 E).