NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 52

No. 23-AP-418

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| Aita Gurung | June Term, 2025 |

John L. Pacht, J.

Charity R. Clark, Attorney General, and Sophie Stratton and Zachary Chen, Assistant Attorneys General, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, Rebecca Turner, Appellate Defender, and Phoebe Cykosky, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **WAPLES, J.** A jury convicted defendant Aita Gurung of first-degree murder of his wife and second-degree attempted murder of her mother, rejecting his affirmative defense of insanity. On appeal, he raises five claims: 1) a previous, dismissed prosecution against him barred the subsequent prosecution in which he was found guilty; 2) the court infringed his rights to a public trial and to participate in his own defense; 3) the jury instructions were confusing and incomplete; 4) the court failed to protect the impartiality of the jury by allowing the deliberating jurors unfettered access to the graphic cell-phone video of the attack; and 5) the trial court did not take sufficient measures to ensure that defendant received competent language interpretation. We affirm.

¶ 2. We address each argument in turn, providing the relevant facts and procedural history as salient to each of defendant's arguments.

## I. Preservation

¶ 3. The State contends that several of defendant's arguments on appeal were not preserved for our review. We therefore begin by clarifying our preservation requirements in criminal cases.

¶ 4. Preservation "refers to whether a litigant specifically raised an issue with the trial court" below. State v. Kandzior, 2020 VT 37, ¶ 16, 212 Vt. 260, 236 A.3d 181. We have repeatedly "stressed that we will not decide issues that have not been properly preserved for appeal." State v. Brink, 2008 VT 33, ¶ 6, 183 Vt. 603, 949 A.2d 1069 (mem.) "To properly preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." State v. Ben-Mont Corp., 163 Vt. 53, 61, 652 A.2d 1004, 1009 (1994). The appellate rules reinforce the need for an appellant, in making a claim of error, to indicate "the issues presented [and] how they were preserved." V.R.A.P. 28(a)(4). "We require parties to raise issues below because a failure to preserve an issue deprives the opposing party of an opportunity to develop a factual record and denies the court the chance to take evidence, make findings, and render a decision for our review." State v. Washburn, 2024 VT 45, ¶ 10, __ Vt. __, 325 A.3d 136 (quotation omitted).

¶ 5. However, as a Court, we have not always been consistent in the language we use to describe the consequences of failing to preserve an issue. On some occasions, we have explained that a defendant's "failure to offer timely, specific objections when the issues were raised waives his right to appeal those issues," State v. Fisher, 167 Vt. 36, 43, 702 A.2d 41, 46 (1997), or that a defendant's failure to object at trial means that "a defendant's right to raise this issue on appeal is waived." State v. Turner, 2003 VT 73, ¶ 14, 175 Vt. 595, 830 A.2d 122 (mem.); see also State v. Boyer, 2023 VT 40, ¶ 33, 218 Vt. 267, 308 A.3d 408. On other occasions, we have explained that

2

where "[d]efendant did not raise [an] argument" below, it is "forfeited on appeal," State v. Davis, 2018 VT 33, ¶ 18, 207 Vt. 346, 186 A.3d 1088, or that an issue is " 'forfeited through a party's failure to raise it below.' " State v. Lambert, 2021 VT 23, ¶ 45, 214 Vt. 425, 255 A.3d 747 (quoting State v. Yoh, 2006 VT 49A, ¶ 36, 180 Vt. 317, 910 A.2d 853).

¶ 6. The informality with which we have used the term "waiver" obscures how we handle distinct types of preservation errors. Waiver "requires proof of a voluntary and intentional relinquishment of a known and enforceable right." State v. Freeman, 2013 VT 25, ¶ 9, 193 Vt. 454, 70 A.3d 1008 (quoting State v. Baker, 2010 VT 99, ¶¶ 11-12, 189 Vt. 543, 12 A.3d 545 (mem.)). Unlike waiver, which involves a conscious choice, "forfeiture is the failure to make the timely assertion of a right." United States v. Olano, 507 U.S. 725, 733 (1993); see also Yoh, 2006 VT 49A, ¶ 36 (describing forfeiture as occurring through "party's failure to raise [issue] below").

¶ 7. This distinction is essential to our approach to an error asserted on appeal because the consequences of waiver[1] and forfeiture differ. "[I]ssues involving waiver . . . do not receive appellate review, and those involving forfeiture" are "review[ed] for plain error." United States v. Cruz-Rodriguez, 570 F.3d 1179, 1183 (10th Cir. 2009); see also United States v. Lewis, 125 F.4th 69, 74 (2d Cir. 2025) ("A true waiver extinguishes the claim altogether and will negate even plain error review." (quotation omitted)).

¶ 8. We have drawn this distinction in our case law by calling true waiver, "[i]nvited error," and describing it as "a branch of the doctrine of waiver." State v. Alzaga, 2019 VT 75, ¶ 26, 211 Vt. 111, 221 A.3d 378 (quotation omitted). When a party has invited an error—that is, waived it in the formal sense—"[t]here is no standard of review" because "the party who invites

---

[1] This clarification of language relevant to the preservation of claims of error on appeal does not affect our case law about when a defendant needs to personally waive a right or when counsel may waive the right on a defendant's behalf. See State v. Hance, 157 Vt. 222, 224, 596 A.2d 365, 366 (1991) (noting "our decisions authorize a defendant to waive virtually any right, constitutional or statutory, as long as the waiver is knowing, intelligent, and voluntary" and collecting cases).

3

the error . . . relinquishes their right to challenge it on appeal." State v. Morse, 2019 VT 58, ¶ 7, 211 Vt. 130, 219 A.3d 1309 (alteration and quotation omitted). Such errors preclude even a plain-error analysis. State v. Spooner, 2010 VT 75, ¶ 23, 188 Vt. 356, 8 A.3d 469 (rejecting availability of plain-error review when error is invited). However, when a party merely forfeits a claim, such as by failing to raise the issue below, we may review the matter for plain error, at least where the appellant argues that the error amounts to plain error. State v. Nash, 2019 VT 73, ¶ 14, 211 Vt. 160, 221 A.3d 386; State v. Hinchliffe, 2009 VT 111, ¶ 34, 186 Vt. 487, 987 A.2d 988.

¶ 9. Thus, to decide whether an issue is waived, and not subject to any review, or forfeited, and potentially subject to plain-error review, we must evaluate whether the record demonstrates "proof of a voluntary and intentional relinquishment of a known and enforceable right." Freeman, 2013 VT 25, ¶ 9 (quotation omitted). To do so, we first look to whether the defendant at trial "affirmatively agree[d] to the process," Alzaga, 2019 VT 75, ¶ 26, or "induce[d] an erroneous ruling from the trial court" by making " 'a deliberate choice.' " State v. Caron, 2020 VT 96, ¶¶ 10, 12, 213 Vt. 414, 247 A.3d 146 (quoting Alzaga, 2019 VT 75, ¶ 26). Under certain circumstances reflecting " 'great potential for sandbagging the trial court,' " we have even concluded that "silence amounted to . . . waiver," precluding plain-error review. Freeman, 2013 VT 25, ¶ 9 (quoting In re Cardinal, 162 Vt. 418, 421, 649 A.2d 227, 230 (1994), petition for writ of habeas corpus denied sub. nom. Cardinal v. Gorczyk, 81 F.3d 18, 20 (2d Cir. 1996) (agreeing with this Court's decision that defendant "waived his Sixth Amendment right . . . by failing to assert that right")).

¶ 10. In the following analysis of each of defendant's claims, we use "waiver" and "forfeiture" as indicated here and not in the imprecise manner of some of our past cases.

## II. Effect of Prior Dismissed Prosecution

¶ 11. Defendant killed his wife and severely wounded his mother-in-law by attacking them with a meat cleaver in October 2017. He was arrested at the scene of the attack and taken

into custody. He was held in police custody until the next day, when the Chittenden County State's Attorney filed charges of first-degree murder and attempted first-degree murder. Defendant pleaded not guilty. The court ordered a competency and sanity evaluation,[2] and defendant was admitted to a psychiatric-care hospital for that evaluation.

¶ 12. According to the court's order, Dr. Paul Cotton evaluated defendant. In December 2017, he opined that defendant was competent to stand trial and legally insane at the time of the attack. Defendant then filed a notice of insanity defense and adopted Dr. Cotton as his expert. The State then retained Dr. Albert Drukteinis to opine on defendant's sanity at the time of the attack. The court ordered defendant to submit to that additional sanity evaluation. In response, defendant retained another expert, Dr. David Rosmarin, to offer another opinion on defendant's sanity. Both Dr. Rosmarin and Dr. Drukteinis also opined that defendant was insane at the time of the offenses.

¶ 13. In February 2019, the court held a status conference during which the parties requested a half-day bench trial. Counsel and the court discussed the procedure for a trial, and the court set another status conference. Later, the parties represented that they were working towards an alternate resolution.

¶ 14. In May 2019, the state's attorney dismissed the charges. The dismissal notice detailed the procedural history of the case. It explained that the case "present[ed] the issue of whether" defendant was legally insane at the time of the attack, meaning that he lacked criminal responsibility for his actions. The dismissal articulated the state's attorney's position that "it is the State's belief that they have a prosecutorial duty not to go forward with the charge" if the "State

---

[2] Competence to stand trial is a distinct inquiry from insanity at the time of an alleged offense. A competence inquiry evaluates a defendant's capacity to stand trial at the time of the inquiry. See, e.g., In re Hemingway, 168 Vt. 569, 570, 716 A.2d 806, 809 (1998) (mem.) ("Due process requires that a criminal defendant be mentally competent in order to be tried or permitted to plead guilty."). An insanity defense requires analysis of the defendant's mental state "at the time of" the criminal conduct. 13 V.S.A. § 4801.

does not have sufficient evidence to rebut [d]efense counsel's evidence that [d]efendant was insane at the time of the offense." In light of the experts' opinions, the state's attorney explained:

> Defendant has substantial admissible evidence to prove by a preponderance of the evidence that he was insane at the time the crimes were committed and is therefore not criminally responsible. The State does not have sufficient evidence to rebut this insanity defense. Therefore, the State cannot meet its burden of proving the [d]efendant is guilty beyond a reasonable doubt; rather, the evidence shows that [d]efendant was insane at the time of the alleged offenses.

The dismissal explained that defendant was in the custody of the Department of Mental Health, which would maintain custody over him until "the community can be assured that he is no longer a risk of harm to himself or others, and the interests of justice have been served." Accordingly, the state's attorney dismissed the charges against defendant without prejudice.

¶ 15. In early September 2019, the Department concluded that defendant no longer met the criteria for hospitalization and placed him into a therapeutic-care residence. Almost immediately thereafter, the Attorney General filed the instant criminal case, bringing the same charges against defendant again.

¶ 16. Defendant then filed a motion to dismiss the charges filed against him by the Attorney General. He argued, in relevant part, that the state's attorney's notice of dismissal bound the State and thus barred the Attorney General's prosecution, and that the Attorney General's "re-prosecution of the same charges" violated the principle of collateral estoppel. The trial court denied the motion to dismiss. On appeal, defendant raises three arguments about why the second prosecution was improper.

A. Authority of Attorney General to Refile Charges

¶ 17. Defendant first argues that the Attorney General lacks the authority to refile charges after a state's attorney dismisses them, Off. of State's Att'y Windsor Cnty. v. Off. of the Att'y Gen., 138 Vt. 10, 409 A.2d 599 (1979), and that the Attorney General must defer to the state's

6

attorney's exercise of discretion. Gould v. Parker, 114 Vt. 186, 42 A.2d 416 (1945); State v. Reed, 127 Vt. 532, 253 A.2d 227 (1969).

¶ 18.    This argument is without merit.  In Office of State's Attorney, we were faced with a similar situation.  The Windsor County State's Attorney office exercised its discretion and declined to prosecute a person arrested for suspected driving while intoxicated.  The Attorney General later instituted criminal proceedings against the driver.  The state's attorney sued, seeking to enjoin the Attorney General from prosecuting the matter, and arguing that "he had committed the State to a course of action and his decision could not be overturned except by an officer with superior authority to act on behalf of the State."  Off. of State's Att'y, 138 Vt. at 12, 409 A.2d at 601.

¶ 19.    This Court disagreed.  After a review of the relevant statutes, we explained that "the two offices share equal authority to initiate criminal prosecutions."  Id. at 13, 409 A.2d at 601.  Though a decision by a state's attorney was "entitled to great deference," by "exercising its discretion and deciding not to prosecute[,] the [s]tate's [a]ttorney did not commit the State to any course of action" and the Attorney General was "free to pick up where the [s]tate's [a]ttorney left off."  Id. at 13-14, 409 A.2d at 601-02.

¶ 20.    So too here.  The reasoning of Office of State's Attorney applies equally to a dismissal without prejudice.  Such a dismissal "before jeopardy attaches does not operate as an acquittal or prevent further prosecution of the offense."  State v. Forbes, 147 Vt. 612, 616, 523 A.2d 1232, 1235 (1987).  It is irrelevant that in Office of State's Attorney, the state's attorney initially declined to prosecute the person accused of a crime, because dismissal without prejudice leaves a defendant in the same position as if the charges had never been brought.  The state's attorney has authority to refile a prosecution that was previously dismissed without prejudice, and the Attorney General holds the same power.

7

## B. Judicial Admissions

¶ 21.    Defendant further argues that statements made by the state's attorney amount to judicial admissions that concede defendant's insanity, such that the Attorney General would be bound by those admissions and could not prosecute defendant again.  Defendant did not present this argument to the trial court in his motion to dismiss the second prosecution.  Though the trial court's decision on the motion to dismiss noted that parts of the state's attorney's notice of dismissal could "be argued to operate as judicial admissions, and so binding on the State," it concluded that "neither party has addressed these issues" and so "decline[d] to wade into [those] waters."  Because defendant did not present this claim below, this Court neither has the benefit of the trial court's analysis of the legal issues, nor do we have any factual findings by the trial court.

¶ 22.    "An issue is not preserved for appeal unless it has been raised at trial with sufficient specificity to afford the trial court an opportunity to fully develop the relevant facts and to reach considered legal conclusions."  State v. Rideout, 2007 VT 59A, ¶ 19, 182 Vt. 113, 933 A.2d 706 (quotation omitted).  Defendant did not preserve this argument for appeal by raising it for the trial court and he thereby forfeits the argument.  On appeal, he does not argue this asserted error was plain, so we decline to address his argument.  State v. White, 172 Vt. 493, 499, 782 A.2d 1187, 1192 (2001) (declining to address claim raised for first time on appeal where party failed to assert plain error); see also State v. Orost, 2025 VT 15, ¶ 26, __ Vt. __, 336 A.3d 345 (declining to address unpreserved argument where defendant "does not argue plain error").

## C. Collateral Estoppel

¶ 23.    Defendant finally argues that the second prosecution against him was barred by collateral estoppel, forbidding the State from relitigating the issue of his guilt of the crimes charged or his insanity.  The trial court in the second prosecution rejected this argument.

¶ 24.    "Collateral estoppel, or issue preclusion, bars the subsequent relitigation of an issue."  Scott v. City of Newport, 2004 VT 64, ¶ 8, 177 Vt. 491, 857 A.2d 317 (mem.) (quotation

omitted). The applicability of issue preclusion to a given set of facts is a question of law we review de novo. State v. Pollander, 167 Vt. 301, 304, 706 A.2d 1359, 1360-61 (1997). Issue preclusion applies when:

> (1) preclusion is asserted against one who was a party in the prior action; (2) the same issue was raised in the prior action; (3) the issue was resolved by a final judgment on the merits; (4) there was a full and fair opportunity to litigate the issue in the prior action; and (5) applying preclusion is fair.

In re Cent. Vt. Pub. Serv. Corp., 172 Vt. 14, 20, 769 A.2d 668, 673 (2001).

¶ 25. The issues of defendant's guilt and his insanity were not "resolved by a final judgment on the merits" in the first prosecution because the state's attorney dismissed the case before a resolution on the merits. Id. In a criminal case, when an "attorney for the state . . . file[s] a written dismissal of an indictment," the "prosecution shall thereupon terminate." V.R.Cr.P. 48(a). Here, the state's attorney concluded that it did "not have sufficient evidence to rebut [defendant's] insanity defense" and accordingly dismissed the prosecution without prejudice. But a dismissal without prejudice "only puts an end to the suit then pending . . . and is not a bar to a subsequent suit for the same cause of action" because it "has only the effect of a nonsuit." Hazen v. Lyndonville Nat. Bank, 70 Vt. 543, 550, 41 A. 1046, 1048 (1898).

¶ 26. Because the state's attorney's dismissal was without prejudice, it did not result in a "final judgment on the merits," and issue preclusion does not apply. Cent. Vt. Pub. Serv. Corp., 172 Vt. at 20; 769 A.3d at 673; accord Varner v. Eves, 990 P.2d 357, 363 (Or. Ct. App. 1999) (concluding plaintiff's dismissal did not result in issue being "actually litigated and determined" so issue preclusion did not bar subsequent litigation of issue (quotation omitted)); Massey v. Shelter Life Ins. Co., No. 05-4106-CV-C-NKL, 2005 WL 1950028, at *2 (W.D. Mo. Aug. 15, 2005) ("Under Missouri law, collateral estoppel will not apply when the plaintiff dismissed the first suit without prejudice, because such a dismissal is not an adjudication on the merits.").

¶ 27.    We thus reject defendant's claims that the previous, dismissed prosecution against him bars the second criminal case against him.[3]   For the remainder of this opinion, when we reference the court or the trial, we refer to the second prosecution that led to his convictions.

### III.  Exclusion from Public Trial

¶ 28.    Defendant challenges several instances during his trial where either he or the public were excluded.  He first asserts that the court erred in allowing counsel for both parties to exercise their peremptory strikes and to raise their for-cause challenges to potential jurors in chambers, out of the presence of him and the public.  He then asserts that the court erred by failing to ensure defendant's presence at the hearing related to his motion for judgment of acquittal and during the charging conference.

### A.  Exercise of Peremptory and For-Cause Challenges Before Trial

¶ 29.    The jury selection process[4] for the trial was extensive.  Over four days, the parties extensively questioned each prospective juror.  On the final day of jury selection, the court explained that counsel and the court were going to exercise peremptory challenges out of the courtroom.  Defense counsel agreed to moving the discussion out of the courtroom.  On appeal,

---

[3]  In this appeal, defendant moved for this Court to take judicial notice of the transcripts of status conferences from the first prosecution, in support of its arguments about both judicial admissions and collateral estoppel.  Since defendant's argument about judicial admissions is unpreserved for our review and defendant cannot show collateral estoppel regardless of the content of the transcripts, we deny defendant's request that the Court take judicial notice of those transcripts.  Even if the Court could take judicial notice of transcripts of a related criminal proceeding, the transcripts here are unnecessary to resolve the issues before us.

[4]  To select a jury for a criminal matter, the trial court will first create a jury pool, or venire pool, from which all the jurors in a case are to be drawn.  These prospective jurors are randomly selected from lists of registered voters and licensed drivers in the county of the prosecution.  When the jury pool is brought in as prospective jurors for a specific case, the court and the parties may question the prospective jurors in a process called voir dire.  At the conclusion of voir dire, the parties may request that the court dismiss specific prospective jurors for or without cause.  Challenges to a juror's participation without cause are called peremptory challenges.  After the parties have exercised their allotted challenges, the court will seat the jury with the remaining jurors.

defendant now challenges the exclusion of him and the public from the exercise of the juror challenges.

¶ 30.    The last day of jury selection began with a brief discussion between counsel and the court about the plan for the day.  After defense counsel raised that she was unable to hear two prospective jurors the previous day, both those jurors were separately brought up to the bench and questioned.  At that point, the venire pool was brought back into the courtroom.  Defense counsel and the State then took turns asking further questions of the assembled pool.

¶ 31.    The court explained to the jurors that it was "going to take the attorneys" to the back room "for the peremptories."  Defense counsel responded: "[t]hat will be fine, Your Honor."  The court and counsel went into chambers, shut the door, and the court confirmed that their discussion would be on the record but not audible to others.  The parties and the court discussed logistics, including how many peremptory challenges each party would have and the process for exercising them.  Both parties exercised their peremptory challenges.  Defense counsel also requested that the court strike a juror for cause, which the court granted over the State's objection.  Counsel and the court returned to the courtroom, where the parties conducted another round of general voir dire with the new prospective jurors.  The Court instructed counsel to "take a few minutes and then come join me in the back."  The parties exercised more peremptories and returned to the courtroom.  The court finally announced the final jury selected for trial.

¶ 32.    As an initial matter, we note that the in-chambers conversations between the court and counsel for the parties were functionally akin to sidebar conferences[5] in the courtroom.  See, e.g., United States v. Vaghari, 500 F. App'x 139, 150 (3d Cir. 2012) (explaining that conducting portion of voir dire "behind 'closed doors' " was "functional equivalent of a sidebar conversation and no more improper than that commonly accepted practice"); Wilder v. United States, 806 F.3d

---

[5]  The sidebar is a "position at the side of a judge's bench where counsel can confer with the judge beyond the jury's earshot."  Sidebar, Black's Law Dictionary (12th ed. 2024).  A sidebar conference is a discussion between a judge and counsel for the parties at the sidebar.

653, 660 (1st Cir. 2015) (affirming district court's finding that such procedures were " 'functional equivalent' of a sidebar conference" because "only difference" was that others could not see "facial expressions or body language").

## 1. Exclusion of Defendant

¶ 33.    "One of the most basic of the rights guaranteed by the [Sixth Amendment] is the accused's right to be present in the courtroom at every stage of his trial." Illinois v. Allen, 397 U.S. 337, 338 (1970).  Vermont has codified this right in Vermont Rule of Criminal Procedure 43, which provides that "[t]he defendant shall be present at the arraignment, at any subsequent time at which a plea is offered, [and] at every stage of the trial including the impaneling of the jury." V.R.Cr.P. 43(a).  Defendant's right to be present applies " 'at any stage of the criminal proceeding that is critical to its outcome.' " State v. Grace, 2016 VT 113, ¶ 12, 204 Vt. 68, 165 A.3d 122 (quoting Kentucky v. Stinger, 482 U.S. 730, 745 (1987)).

¶ 34.    Defendant points to Cohen v. Senkowski to assert that his right to be present was violated here.[6]  290 F.3d 485 (2d Cir. 2002).  That case provides that the "pre-screening of prospective jurors is a material stage of trial at which the defendant has a constitutional right to be present." Id. at 489.  However, that same case held that the defendant "did not have a constitutional right to be present during the juror challenges conducted in . . . chambers," where the defendant was present for the questioning of jurors and had the opportunity to consult with counsel, and where the announcement of which jurors were to be struck was made in open court. Id. at 490. This decision is in accord with several other federal appeals courts.  See, e.g., United States v. Fontenot, 14 F.3d 1364, 1370 (9th Cir. 1994); United States v. Gayles, 1 F.3d 735, 738 (8th Cir. 1993); United States v. Bascaro, 742 F.2d 1335, 1349-50 (11th Cir. 1984), abrogated on other grounds by United States v. Lewis, 492 F.3d 1219, 1221 (11th Cir. 2007).  We have also

---

[6] Defendant did not object to his exclusion from this process at trial and defendant does not raise a plain-error challenge to his exclusion.  However, because defendant contests whether his attorney could waive defendant's presence on his behalf, we evaluate his claim of error.

acknowledged that defense counsel's "exercise of peremptory challenges at [the] bench did not violate rights of [the] defendant who was in court but not at [the] bench." Cardinal, 162 Vt. at 422, 649 A.2d at 230 (citing Tatum v. United States, 330 A.2d 522, 524 (D.C. Ct. App. 1974)).

¶ 35. These cases demonstrate that defendant's exclusion from the juror-challenge conferences did not violate his right to confrontation because the exclusion was limited to the exercise of challenges and defendant was present for the critical stages of the jury-selection process. See Cohen, 290 F.3d at 490 (explaining defendant's right to presence at trial "were sufficiently preserved by his presence during the questioning of jurors, his opportunities to confer with counsel, and the formal announcement of the stricken and seated jurors in open court"). Defendant was present in the courtroom for the questioning of prospective jurors. Defense counsel and defendant had time to consult between the conclusion of voir dire questioning in the courtroom and the in-chambers conferences to exercise peremptory and for-cause strikes. After each conference, the court announced in open court the jurors who were struck.

¶ 36. Because our conclusion does not rely on defense counsel's agreement to conducting challenges in chambers, we do not reach the question of whether defense counsel could agree to this process and waive defendant's right to be present or whether a colloquy directly with defendant was required.

## 2. Exclusion of the Public

¶ 37. Under the Sixth and Fourteenth Amendments of the U.S. Constitution, a defendant has a right to a public trial, which includes the right to have the public present during jury selection. Presley v. Georgia, 558 U.S. 209, 210, 213-15 (2010). Because the trial court heard peremptory and for-cause challenges in chambers—out of the presence of the public—defendant argues that he was denied the right to a public trial. On appeal, defendant argues that this error is structural and thus requires reversal without a showing of prejudice.

13

¶ 38.    Defendant does not point to any cases that support his argument that the exclusion of the public from the exercise of juror challenges violates his right to a public trial.  The cases he cites do not discuss the exercise of such challenges; rather, they discuss the questioning of jurors.  In Presley v. Georgia, the U.S. Supreme Court reversed a conviction on direct appeal where the public was excluded from the voir dire of prospective jurors.  558 U.S. at 213.  The Second Circuit in United States v. Gupta similarly explained that the "intentional, unjustified exclusion of the public for the entirety of voir dire was neither brief nor trivial, and thus violated [the defendant's] Sixth Amendment right to a public trial."  699 F.3d 682, 685 (2d Cir. 2012).

¶ 39.    Indeed, several cases suggest a meaningful difference between voir dire, which is presumptively open to the public, and the exercise of juror challenges.  See, e.g., Morales v. United States, 635 F.3d 39, 44 (2d Cir. 2011) (noting peremptory challenges "are seldom, if ever, registered within the earshot of spectators, so the public was not precluded from witnessing anything to which it otherwise would have been privy"); United States v. Lee, 290 F. App'x 977, 978-79 (9th Cir. 2008) (explaining court could locate no case "where closing the courtroom during for-cause challenges alone was deemed to violate the right to a public trial"); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 598 n.23 (1980) (Brennan, J., concurring in the judgment) (suggesting right to public trial does not extend to "interchanges at the bench" or bar judges' "ability to conduct conferences in chambers").

¶ 40.    This distinction is important.  The questioning of jurors should be public because it allows the public to understand who is going to be deciding the facts of the case.  But the public need not hear attorneys' challenges to the participation of certain potential jurors.  Such an exercise is likely to be prejudicial to one or both parties if other prospective jurors could hear the challenges.  Indeed, the Second Circuit once explained that "it would be beneficial to the administration of justice if an equitable method of jury selection could be devised that would [not] disclose to the

14

jury which party had excused a particular" prospective juror.  United States v. Severino, 800 F.2d 42, 48 (2d Cir. 1986).

¶ 41.    The facts presented by this case do not amount to any exclusion of the public from any portion of the jury selection which the public was entitled to hear.  Accordingly, there was no error, let alone plain error.

   B.  Hearing on Motion for Judgment of Acquittal and the Charging Conference

¶ 42.    At the conclusion of the State's presentation of its case-in-chief, defendant moved in open court under Criminal Rule 29 for a judgment of acquittal for both charges.  The court denied defendant's motion with respect to the murder charge.  But the court reserved judgment as to the attempted-murder charge.

¶ 43.    Defendant finished presenting his case in the morning of October 26, 2022.  After the jury was excused, the court and counsel for the parties had a lengthy discussion about how to proceed.  Before defendant and the court-provided interpreters left for the day, counsel and the court agreed that the jury would not be returning the following day, on October 27, to allow time for further legal argument about the jury charge and the motion for judgment of acquittal, and to plan for closings on October 28.  Accordingly, the court explained that it would "cancel transport [for defendant] for tomorrow" and defense counsel replied "[t]hat will be fine, Your Honor."  The court and the parties then took a short break.

¶ 44.    In the afternoon of October 26, the court explained that their ensuing discussion would be "an attorney's only conference" and that defense counsel waived defendant's appearance for the purpose of legal arguments.  That same afternoon, defense counsel reraised defendant's request for a judgment of acquittal under Rule 29.  The court asked instead to turn to the jury instructions at that time, and to plan to discuss the Rule 29 motion the following morning.  The following morning, October 27, counsel and the court addressed the motion and the final set of jury instructions.  Before starting, the court asked defense counsel to confirm that "[w]e're not

15

going to have [defendant] today," and counsel confirmed. This record demonstrates that defense counsel both waived defendant's presence and considered the motion hearing and the charge conference to be of a legal, and not factual, nature. See Grace, 2016 VT 113, ¶ 14 (distinguishing between factual hearing and hearing where "only issue was one of law and the outcome could not have been affected by defendant's absence").

¶ 45. Defendant contends on appeal that excluding defendant from the motion hearing and from the discussion of the jury charge was plain error. Defendant's contention that the "court failed to make any findings or inquiry into [defendant's presence] beyond confirming whether [he] would be in court" that day is unsupported by the record here. Given defense counsel's repeated, on-the-record consent to defendant's absence for these matters, defendant intentionally invited this purported error. Having "specifically agreed to this process below," defendant waived this claim; we will not consider this argument on appeal. Alzaga, 2019 VT 75, ¶ 26.

## IV. Jury Instructions

¶ 46. Defendant raises two challenges to the jury instructions: (1) the trial court's denial of his request to include a "consequences" instruction; and (2) the supplemental insanity instruction the court offered in response to a mid-deliberation question from the jury. We review each challenge in turn.

### A. Consequences Instructions

¶ 47. Ahead of trial, defendant requested that the court instruct the jury on the consequences of a verdict of not guilty by reason of insanity. Because of the publicity this case generated, the trial court distributed supplemental questionnaires to prospective jurors, which asked about their feelings about a not-guilty-by-reason-of-insanity verdict. A portion of those prospective jurors indicated confusion about the nature and consequences of the verdict. The court nonetheless denied the request.

16

¶ 48.    The trial court did not err.  In <u>State v. Smith</u>, when we were asked to rule on the "propriety of informing the jury as to the institutional disposition of the defendant should they find him not guilty by reason of insanity," we held "that the disposition after verdict is for the court, and is not to be charged to the jury."  136 Vt. 520, 526, 396 A.2d 126, 129 (1978).  We acknowledged "the problem of the public conception of a murderer set free," and explained that knowledge concerning punishment could, nevertheless, "not aid a jury in determining whether or not a defendant was guilty of the offense charged."  <u>Id</u>.

¶ 49.    This decision was well-founded in our long-standing precedent that the consequences of a jury's verdict are not for the jury to consider.  See, e.g., <u>Fulsome v. Town of Concord</u>, 46 Vt. 135, 141 (1872) (affirming jury instruction telling jury to put aside its sympathies and forget, "as far as may be, the parties and consequences of your determination"); <u>State v. Lapan</u>, 101 Vt. 124, 142-43, 141 A. 686, 695 (1928) (affirming jury instructions in conviction for manslaughter and explaining that jurors "were correctly instructed that they had nothing to do with the penalty, and that it should not enter into their consideration or discussion").

¶ 50.    The more-recent case of <u>State v. Delisle</u> did not modify our long-standing rule.  162 Vt. 293, 648 A.2d 632 (1994).  In <u>Delisle</u>, we were faced with the issue of how to instruct a jury when a conviction for a lesser-included offense would be barred by the running of the statute of limitations for that offense.  In such situations, we explained "that the rights of defendants and the integrity of the system would be best maintained" by giving defendants the option of either "foregoing the instruction on the time-barred, lesser-included offense" or providing the lesser-included instruction with notice to the jurors that, due to the passage of time, "they must acquit the defendant if they conclude that the evidence would support a conviction of the lesser crime only."  <u>Id</u>. at 305, 648 A.2d at 639-40.  In explaining our reasoning, we noted that the rule from <u>Smith</u> "would not apply in a situation where the jury was misled."  <u>Id</u>. at 303, 648 A.2d at 639 (citing <u>State v. Percy</u>, 146 Vt. 475, 478-79, 507 A.2d 955, 957-58 (1986)).

17

¶ 51.    In State v. Percy, we concluded there was no reversible error in the prosecutor's improper comment in closing argument which implied that a not-guilty-by-reason-of-insanity verdict would "let [the defendant] go," because the court offered a proper curative instruction and "specifically instructed the jury that the dispositional consequences of an insanity verdict [were] not for their consideration."  146 Vt. at 478-79, 507 A.2d at 957.  We expressly affirmed the trial court's corrective instruction to the jury which stated: "What happens to [the defendant] as a result of your verdict, whether it's not guilty, guilty or not guilty by reason of insanity, is not your worry. That's my problem."  Id. at 479 n.2, 507 A.2d at 957 n.2.  The court further told the jurors that they "should not be in any way influenced in [their] determination about whether [their] verdict will cause him to be let go, as they say, or anything else."  Id.

¶ 52.    Defendant asserts that he can show that the jury was misled about the consequences of a not-guilty-by-reason-of-insanity verdict here and so reached a guilty verdict instead.  After trial, nine of the twelve jurors sent the court a letter which advocated "for continued hospitalization of [defendant] in a secure psychiatric facility rather than imprisonment in a correctional facility due to the severity of his mental disease."  Based on this letter, defendant contends the jury did not understand the consequences of finding him insane.  However, this letter reflects no confusion over the consequences of an insanity verdict.  Instead, it reflects the jurors' concern over the carceral consequences of a guilty verdict.  Moreover, the letter opens by stating: "it could not be proven that [defendant] met the test of insanity by a preponderance of the evidence as presented in this case."  This letter does not support defendant's assertion that the jury was misled about the consequences of a verdict of not-guilty-by-reason-of-insanity.  Accordingly, neither Delisle, Percy, nor Smith allowed the trial court, much less required it, to give a consequences instruction.

¶ 53.    Defendant also points us to the American Bar Association's Criminal Justice Mental Health Standards, which state that "the court may instruct the jury as to the dispositional consequences of a verdict of not guilty by reason of mental nonresponsibility [insanity]."  A.B.A.,

18

The American Bar Association's Criminal Justice Mental Health Standards 195 (2016). The commentary to the standard provides that "jurors who are not informed about dispositional consequences will naturally speculate about the practical results of a nonresponsibility verdict and, in ignorance of reality, will convict persons who are not criminally responsible in order to protect society." Id. at 196.

¶ 54. This Court has previously confronted these arguments and rejected them. Without some need for a curative instruction, trial courts should not give instructions to the jury on the consequences of a not-guilty-by-reason-of-insanity verdict. Smith, 136 Vt. at 526, 396 A.2d at 129; accord Shannon v. United States, 512 U.S. 573, 579-88 (1994) (affirming trial court's refusal to give consequences instruction because "[i]nformation regarding the consequences of a verdict is . . . irrelevant to the jury's task"). Juries play an essential fact-finding role in our criminal-justice system. See State v. Morrill, 127 Vt. 506, 512, 253 A.2d 142, 146 (1969) ("There can be no question in this state but that in a criminal case the jury, under proper guidance and direction of the court, makes the ultimate decision on the issues of fact presented to it."). Knowledge about the punishment for some charge can play no role in the jury's determination of "whether or not a defendant was guilty of the offense charged." Smith, 136 Vt. at 526, 396 A.2d at 129. We decline to depart from this long-standing rule here.

B. Supplemental Jury Instruction

¶ 55. During the third day of jury deliberations, the jury sent the court a question seeking clarification on the test for insanity. The jurors asked for "clarity on the wording of the test of insanity. Specifically, if at any point one lacks adequate capacity to conform their behavior to the requirements of the law, but has adequate capacity to conform at other points, is the standard met, assuming the mental defect disease requirement is met."

¶ 56. Counsel and the court discussed how to respond. Defense counsel asked the court to clarify that the conduct the jury should consider was "striking [defendant's wife]

19

and . . . striking [defendant's mother-in-law] multiple times about the head and the body with a meat cleaver," but added that they did not "want to create confusion either." The court declined, explaining its position that it would be "best for both sides if [it] just le[ft] the charge as it is," and directed the jury back to the original instructions.

¶ 57. The original jury instructions provided:

> To sustain the defense of legal insanity, [defendant] must have proven the following by a preponderance of the evidence. First, that he suffered from mental disease or defect at the time of the alleged offense or offenses; and second, that as a result of the mental disease or defect, he lacked adequate capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

The supplemental instruction provided:

> It's really at the time of the incident for you to decide whether he had or lacked adequate capacity to conform his conduct within the requirements of law. That's really the crux of what the jury['s] job is. Defining it beyond how it's defined in the statute would probably not actually be that helpful, because it would get us all—that is the core of your job.

¶ 58. We review "jury instructions as a whole to determine if they accurately reflect the law." State v. Snow, 2013 VT 19, ¶ 8, 193 Vt. 390, 70 A.3d 971. We evaluate whether the instructions "were misleading or inadequate to aid the jury's deliberations." State v. Shabazz, 169 Vt. 448, 450, 739 A.2d 666, 667 (1999). We will assign error only "where the instructions undermine our confidence in the verdict." State v. Trombley, 174 Vt. 459, 460, 807 A.2d 400, 403 (2002) (mem.).

¶ 59. As such, we first look at what the law requires. The test for insanity as a defense in criminal cases is: "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacks adequate capacity either to appreciate the criminality of the person's conduct or to conform the person's conduct to the requirements of law." 13 V.S.A. § 4801.

20

¶ 60. Defendant challenges the initial and supplemental instructions as insufficiently clear about the time period in which the jury must find that defendant was legally insane.[7] Defendant argues that the statement the "time of the incident" contradicted the first instruction directing the jury to consider whether he had a mental disease "at the time of the alleged offense or offenses," and that the use of the words "incident" and "offenses" were confusing and did not reflect the statutory definition which references "the time of such conduct."

¶ 61. The instructions given "accurately reflect the law," Snow, 2013 VT 19, ¶ 8, and were neither "misleading [nor] inadequate to aid the jury's deliberations." Shabazz, 169 Vt. at 450, 739 A.2d at 667. The jury spent weeks hearing evidence about defendant's acts on the day of the attack, and his mental health before, during, and after the attack. There is no doubt that the jurors understood the words "incident" and "offenses" to be synonymous with the word "conduct." The jury instructions here do not "undermine our confidence in the verdict," Trombley, 174 Vt. at 460, 807 A.2d at 403, and we see no error.

¶ 62. Defendant further argues that "the State's closing argument exacerbated the error" and encouraged the jury to understand the " 'incident' " as "encompass[ing] moments beyond the specific acts" comprising the charges before the jury. This argument is unpersuasive on the record before us. Defendant and the State both explained to the jury that the charged crimes occurred over several minutes, comprising many individual moments. Even defendant's closing argument walked the jury through the video of the attack nearly second-by-second, encouraging the jury to think about defendant's mental status at each moment. Each moment of the attack highlighted in the closings fell within the "time of such conduct" language in statute and "the time of the incident" instruction given by the court. See 13 V.S.A. § 4801. There was no error in the jury instructions provided.

_____

[7] During the pendency of this appeal, defendant moved to supplement the record on appeal with the PowerPoint slides the State presented during its closing argument. We now grant defendant's motion. The slides presented by the State also state the correct test for insanity.

## V. Juror Access to Graphic Video of Attack

¶ 63. On appeal, defendant contends the court erred in allowing the deliberating jurors to have unmonitored and unlimited access to the graphic and violent cell-phone video of the attack. The State argues that defendant waived this argument by agreeing to giving the jury access to the video, so we should not consider this claim of error.

¶ 64. The cell-phone video at issue was the subject of motion practice before and during trial. Ahead of trial, defendant sought to exclude the video as unduly prejudicial. The court granted in part and denied in part defendant's motion, explaining that the video was relevant but that it would "limit the use and viewing of this evidence" and allow the State to present the video only once during the State's case-in-chief. The court also indicated that the jurors would "not be allowed to view the video again during their deliberations and the video [would] not be taken into the jury room."

¶ 65. The State moved to reconsider the court's order and requested that the jury be allowed to view the video during deliberations. The court partially granted the State's reconsideration request. It "grant[ed] the motion with respect to the jury's deliberations to the extent that should the jury request that they be able to view the video evidence during deliberations, they shall be able to view it in the courtroom" but ordered "the jury shall not take any of the video evidence into the deliberation room."

¶ 66. As part of the jury-selection process, the parties and the potential jurors discussed at length the possibility of graphic video evidence being presented. Prospective jurors were individually asked whether they could view such graphic evidence and still be able to listen to the rest of the evidence presented in the case.

¶ 67. The video was introduced on the first day of trial, over defendant's renewed objection to its admission. After the video was admitted and played for the jurors, the court stated: "[w]e all recognize that was a hard video to watch. We've talked about it a lot in voir dire. Do

22

what you can to take care of yourselves." Later that day, after the jury was released for the day, defense counsel raised for the court's attention that four of the jurors had "dramatic emotional responses" to the video. Counsel and the court discussed, and the court explained that it would not "focus on any evidence that was admitted" but would ask a standard "generalized question of 'any reason you can't be fair and impartial' " the next day of trial. Both parties consented to that plan.

¶ 68. During defendant's presentation of his affirmative defense of insanity, defendant's two expert witnesses explained at length their reliance on the cell-phone video in coming to their conclusions about defendant's insanity at the time of the attack. The first expert noted that he would "defer to the video" for the details about defendant's reactions throughout the attack. The second expert explained that he "watched [the video] many times very carefully" and found it persuasive in showing defendant's outward responsiveness to bystanders.

¶ 69. The State presented another responding expert who testified that the video showed a "very important moment" where defendant addressed bystanders in English because it shows that he had to "recognize that they were English-speaking people" and then translate his words "in his head from Nepali to English." This was significant because, the expert opined, "a person would not be able to do that in . . . that psychotic of a state."

¶ 70. After both parties rested, the trial court reiterated its decision that the jury would be able to take videos into its deliberations "with the exception of [a bodycam video] and the cell-phone video, which they can request." It further explained that videos which "capture the incident" must be viewed in the courtroom.

¶ 71. During closing arguments, the State and defendant discussed the cell-phone video at length. Defense counsel explained how "extraordinary" it was to have "video footage of the incident," and how the experts were given that footage because it was necessary for their analysis. Counsel then explained that she was going to walk jurors through the video "step-by-step" and

encouraged the jurors, "if [they] choose to watch the video," to watch it carefully. She highlighted the "confused expression" on defendant's face as police arrived on the scene and asked the jury to "[w]atch the video. Watch the video when he's on the ground."

¶ 72. Defense counsel then offered the jury "the specifics of video and time stamps" so jurors could "be aware of when certain things are happening so that you can be prepared." Defense counsel explained, in great detail, what the video showed for each of the following time increments of the video: "for the first thirty-three seconds;" "[a]t twenty-seven seconds to thirty-one seconds;" "[a]t thirty seconds;" "[a]t forty seconds;" "between fifty-four seconds and fifty-nine;" "[f]rom one minute to one minute, nineteen;" "at one twenty;" "at one-minute twenty-eight;" and "between one thirty-six and one forty." Counsel provided her summary of the graphic content of the video for each of those moments.

¶ 73. Before deliberations began, the trial court instructed the jury to request any video or audio playbacks in the courtroom, per the court's last ruling on the jury's access to the videos. After the jury began deliberations, it sent a note to the court requesting to view the video with access to "pause, rewind, and review as needed."

¶ 74. At this point, the State asked the court to reconsider its ruling prohibiting the jury from viewing the video during deliberations. Defense counsel agreed to allow the jury access to the video. She explained that it made "sense to allow them to access because it would be very awkward for us to have to click play . . . [a]nd the time stamps do give them the ability to see which portions they want to see." When the jurors returned, the court told them it had "been talking with the parties who have agreed" that the court would "give [them] a thumb drive of that video and let [them] do with it what [they are] comfortable doing with it in [their] deliberations."

¶ 75. This record demonstrates that, despite his earlier objections, defendant was involved in, and agreed to, the court's decision to allow jurors to watch the video unsupervised during their deliberations. See Caron, 2020 VT 96, ¶ 11. Defense counsel's closing argument

encouraged jurors to view the video closely and counsel affirmatively agreed to give jurors the video for unsupervised viewing to empower their close review. In light of this record, we conclude that defendant invited this alleged error and waived this argument through "voluntary and intentional relinquishment of a known and enforceable right." Freeman, 2013 VT 25, ¶ 9 (quotation omitted). We accordingly do not consider defendant's assertion of error[8] on appeal. Morse, 2019 VT 58, ¶ 7.

### VI. Language Interpretation

¶ 76. Defendant is a native Nepali speaker. Two different interpreters provided simultaneous interpretation of the trial proceedings from English to Nepali for defendant at his request. Defendant challenges how the trial court oversaw that interpretation to ensure that defendant received competent interpretation.

¶ 77. For early pre-trial matters, the court provided defendant with consecutive interpretation for court proceedings. Consecutive interpretation means the interpreter listens to the speaker and then provides an interpretation during a pause. For defendant, this meant an interpreter provided the Nepali aloud after someone in the courtroom spoke in English. In contrast, simultaneous interpretation is provided in real time through a headset or similar device and not spoken aloud in the courtroom. The court and the parties regularly discussed the efficacy and efficiency of the interpretation. Defendant also employed his own interpreter, working exclusively for him, to assist with his communication with his attorneys.

¶ 78. Around the time of those early proceedings, the Vermont Judiciary issued its first Language Access and Operations Manual. During one pretrial hearing, the court noted that those

---

[8] Defendant also raises a subsidiary argument that the court erred by not allowing defendant himself to be present during the jury's rewatching of the video. See State v. Koveos, 169 Vt. 62, 72-73, 732 A.2d 722, 729 (1999). For the same reasons discussed above, we conclude that he waived this argument. See Cardinal, 162 Vt. at 423, 649 A.2d at 231 ("Unless a defendant speaks out, normally he must be bound by the trial decisions, actions and inactions of counsel." (quotation omitted)).

standards "make very clear that simultaneous interpretation is the gold standard, and that's what we should be striving for." In that conversation, defense counsel explained that the defense team was interested in shortening the length of trial using simultaneous interpretation but explained that "we have to be able to maintain the record . . . [and] keep a record of what the interpreter is actually interpreting to" defendant.

¶ 79. At the next hearing, the court explained that it had been working with Judiciary staff "to make sure that, for the trial, we get simultaneous interpretation." Thereafter, defendant filed a motion for competent interpreter services, relying on the Manual in support of his requests. The motion requested two interpreters to "combat fatigue and allow[] the resting interpreter to monitor the interpretation for errors or misunderstandings," simultaneous interpretation through the use of an audio headset, and a recording "of all interpreted proceedings, to capture both the English and the non-English speaker."

¶ 80. The trial court granted each of defendant's requests, except it denied his request to provide a recording of the simultaneous interpretation. At the next hearing, the court and the parties used the interpretation system approved in the order. The court addressed defendant directly and told him: "[i]f there's any time . . . that you are having any difficulty understanding anything that is being said, please let your attorneys know immediately, and we will try and correct it or at least deal with whatever is occurring." After defense counsel had problems with the interpreters' speaking distracting counsel, the interpreters were then removed from the courtroom, and instead set up in another room, to provide interpretation services to defendant via WebEx and a headset. The court issued an order explaining that the method that worked at the hearing would be the method "employed going forward for all hearings and the trial itself."

¶ 81. At the next hearing, defense counsel requested that the defense interpreter be allowed to listen to the court-provided interpretation. The court agreed and explained that if there was some issue with the interpretation to "bring [it] up at a break" without interrupting testimony.

26

Defense counsel explained that the defense interpreter would "keep notes if he has concerns or issues to wait for the break to indicate a possible timestamp." The court explained that allowing the defense interpreter to listen would be a "good added precaution" that would "provide[] yet another security as to the legitimacy of the interpretation." The court reiterated that the defense interpreter must direct any issues to defense counsel and instructed defense counsel to bring any relevant issues to the court. This agreed-to system was used for another pre-trial hearing and the four days of jury selection before trial without any issues.

¶ 82.    On the first day of trial, after the jury was selected, the trial court again explicitly instructed the defense that any issues with interpretation should be raised during breaks immediately after the issue arose. That day, defense counsel confirmed with the court that she could "record proceedings as needed" for her own purposes as an attorney, coordinating with witnesses and experts. The court clarified that the recording would not be "an official recording," but allowed her to proceed.

¶ 83.    On the third day of trial, defense counsel raised a specific issue with the interpretation of one of her questions. She asked a Nepali-speaking witness a question for which she expected a certain answer based on his deposition response. As defense counsel explained to the court, the defense interpreter told her that the question was interpreted for the witness somewhat incorrectly, explaining the different answer at trial, and counsel thus sought to strike the testimony. Over the State's objection, the court instructed the jury to strike the testimony because "there was enough reason to be concerned with the [witness's] answer."

¶ 84.    At the beginning of the fourth day of trial, after the State had rested its case-in-chief, the defense raised concerns regarding the quality of the court-provided interpretation. Counsel explained that the defense team spoke with the defense interpreter at more length, and their interpreter raised some general concerns about the interpretation being provided. The court

expressed frustration; it reiterated that its orders were that "if there[] [was] an error, [to] bring it up when it comes up at a break."

¶ 85.   Defense counsel then requested "new interpreters" and requested "a recording of the interpretation." The court initially denied both requests. It explained that it allowed the defense interpreter to listen to the interpretation so he could "let [the court] know if there [was] an issue while it was happening, not" at some later time. The court stated that the "timing of" the raising of the issue gave it "some pause regarding the accuracy of what he is saying," because it was "certainly not consistent with what [the defense interpreter] knew the court order was." Because the defense interpreter, through counsel, had raised the specific issue the previous trial day, the court inferred that the defense interpreter knew he could raise issues promptly "because he [did so] once." At the end of the discussion, the court reiterated its order that defense counsel would need to "bring things to [the court's] attention as they come up."

¶ 86.   Defense counsel explained that defendant's position was that the quality of interpretation is "an objective standard," where "how well [defendant] does or does not understand" is irrelevant. Counsel at no point put forward any proffer or evidence to explain how the purported issues with interpretation affected defendant.[9] The court again explained that its orders to defendant himself were that if "he's not understanding anything, he's to immediately inform his attorney who will inform" the court.

¶ 87.   In response to defendant's request to record the interpretation, the court explained after further discussion with the parties that it would not "prevent [defense counsel] from recording" the interpretation, but that it "was not going to [be] an official court record." The

_____

[9] The record reflects some dispute over whether defendant needed an interpreter. Several of the testifying witnesses at trial had interviewed defendant without an interpreter. The court explained that "there was a question of whether [defendant] really needed this interpreter" but defense counsel "said he did," so the court provided the interpreters as requested.

defense team confirmed that they understood that they had the court's permission to record the interpretation being provided to defendant.

¶ 88.   That afternoon, defendant filed a written motion for "competent interpreters and recording of the interpretation." The written motion reiterated the same arguments raised in court. The motion did not proffer how the issues impacted defendant's understanding; rather, it set forth a detailed statement from the defense interpreter about the quality of interpretation. The defense interpreter alleged that the court's simultaneous interpretation was inaccurate, citing issues such as incomplete Nepali sentences, filler sounds, paraphrasing, and the use of uninterpreted English legal terms. According to the defense interpreter, one of the court interpreters frequently inserted English words such as "defense, testimonies, memory, issues, traumas, effect and accuracy" when interpreting, while the other court interpreter was described as improvising or omitting meaning.

¶ 89.   The court held a hearing the next day to address the interpretation concerns. The court conducted voir dire of the two court-appointed Nepali interpreters and reswore them in. Both interpreters testified to their own efforts and that of the other. Neither reported any apparent issues with the other's interpretation. In addition, the court heard testimony from the Judiciary's Language Access Program's manager, who explained that she spoke with each interpreter separately following defendant's motion and confirmed that they had been listening to the other interpreter's interpretations and noted nothing of concern.

¶ 90.   The court, yet again, reiterated that defense counsel was to "raise an issue as soon as [counsel] learned of it." After the court explained that "we have to move forward with the trial," with the understanding that the defense would raise any issues promptly, defense counsel stated that she "completely agree[d]."

¶ 91.   Ultimately, the court characterized defendant's filing as a motion for a mistrial, which it denied because "the objections were not made during the time when the [c]ourt could correct them, or [it] could address them." The court explained that it would "address any

29

substantive and/or prejudicial issue that [defense counsel] think[s] needs to be addressed" before a witness is released. The court also explained again that the defense team could record the interpretation, to help counsel resolve future issues.

¶ 92. The record does not reflect that the defense raised any further issues with the interpretation during trial. The next time that defendant raised any issues with the interpretation was in a post-trial motion for an evidentiary hearing in support of his request for a new trial. Defendant "incorporate[d] by reference the arguments made in his" mid-trial motion and explained that the evidence he would present would be translations of recorded audio excerpts of the interpretation provided to him. The motion did not allege that defendant's understanding of the proceedings was impaired by the interpretation provided to him.

¶ 93. The court denied defendant's request for an evidentiary hearing because the motion did not "represent[] that the alleged inaccuracies in interpretation had any impact on" defendant. Accordingly, it concluded that defendant "failed to raise . . . a genuine issue of material fact as to whether any issue with the interpretation services provided made his trial fundamentally unfair."

¶ 94. As a separate ground to deny the motion, the court explained that "defense counsel was to raise [any concerns with interpretation] immediately so that they could be addressed in the moment and while the witness, proceeding, or other evidence was being provided" to allow for prompt clarification. The court explained that it was "clear that if defendant did not timely raise the issue, it would be deemed waived," citing Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989) (explaining judge may take corrective measures "[o]nly if the defendant makes any difficulty with the interpreter known to the court" and noting that "[t]o allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse").

A.  Standard for Assessing Competent Interpretation

¶ 95.  "In matters of trial conduct . . . the trial court has wide discretion."  State v. Richards, 144 Vt. 16, 19, 470 A.2d 1187, 1189 (1983).  We review the trial court's conduct with respect to the provision of interpretation services for abuse of discretion.  See United States v. Da Silva, 725 F.2d 828, 830 n.2 (2d Cir. 1983); United States v. Lim, 794 F.2d 469, 471 (9th Cir. 1986) ("[T]he appropriate use of interpreters in the courtroom is a matter within the discretion of the district court.").

¶ 96.  The U.S. Constitution[10] provides a criminal defendant with the "right to a have a competent [interpreter] assist him, at state expense if need be, throughout his trial."  United States v. Henry, 888 F.3d 589, 602 (2d Cir. 2018) (quotation omitted) (locating right in Sixth Amendment).  This right arises from the "nearly self-evident proposition that an indigent defendant who could speak and understand no English would have a right to have his trial proceedings [interpreted] so as to permit him to participate effectively in his own defense."  United States ex rel. Negron v. New York, 434 F.2d 386, 389 (2d Cir. 1970) (locating right in Fifth Amendment).  The reason a defendant is entitled to a competent interpreter is to empower his " 'ability to consult with his lawyer with a reasonable degree of rational understanding' " of the proceedings against him.  Id. (quoting Dusky v. United States, 362 U.S. 402, 402 (1960) (per curium)).

¶ 97.  The right to competent interpretation, whether grounded in the Sixth or Fifth Amendment, serves the purpose of securing a non-English-speaking defendant's rights to meaningfully understand and participate in the proceedings against the defendant.  See United

---

[10]  Defendant also asserts that the Vermont Constitution protects defendant's rights to interpretation but does not explain why or how the Vermont Constitution might differ from the U.S. Constitution.  A.B. v. S.U., 2023 VT 32, ¶ 10, 218 Vt. 123, 298 A.3d 573 ("The Vermont Constitution may provide greater protection than analogous provisions in the U.S. Constitution, but the proponent of such an argument bears the burden of explaining how or why the Vermont Constitution provides greater protection." (quotation omitted)).  Lacking any substantive argument about the Vermont Constitution, we "shall not consider the issue herein."  State v. Maguire, 146 Vt. 49, 54, 498 A.2d 1028, 1031 (1985).

States v. Tapia, 631 F.2d 1207, 1210 (5th Cir. 1980) (explaining if defendant did not receive interpretation, next inquiry is whether "such failure inhibited [defendant's] comprehension of the proceedings, or whether such failure prevented him from assisting his counsel"). Therefore, at its core, defendant's right to competent interpretation is to empower him to participate meaningfully in his trial.

¶ 98. The essential question is thus whether any purported "inadequacy in the interpretation 'made the trial fundamentally unfair.' " Valladares, 871 F.2d at 1566 (quoting Tapia, 631 F.2d at 1210). This inquiry is essentially focused on a defendant's understanding of the proceedings. United States v. Gutierrez-Garcia, No. 22-50742, 2023 WL 5970932, at *3 (5th Cir. Sept. 13, 2023) ("An inquiry into fundamental fairness focuses on whether the purposes of the [Court Interpreters] Act—comprehension of the proceedings and the ability to effectively communicate—were adequately met." (alteration and quotation omitted)), cert. denied, __ U.S. __, 144 S. Ct. 705 (2024); see also Commonwealth v. Lee, 134 N.E.3d 523, 533-35 (Mass. 2019) (looking to defendant's understanding of interpretation as evidenced by his answering over six-hundred interpreted questions to evaluate whether interpretation made his trial "fundamentally unfair" (quotation omitted)); United States v. Mehmood, 742 F. App'x 928, 934 (6th Cir. 2018) (evaluating whether lack of interpreter "affected [defendant's] understanding of the proceedings").

¶ 99. These federal cases align with the standard set forth in Vermont's criminal rules. Criminal Rule 28 states that a court "must provide competent interpreter services when such services are necessary to ensure meaningful access to all court proceedings . . . in or related to criminal actions for a party . . . with limited English proficiency . . . which results in the need for interpreter services."

### B. Mid-Trial Motion

¶ 100. After defendant raised a general issue with the quality of interpretation during trial, the court immediately heard argument on the issue. The next day, the court postponed the

presentation of evidence in the trial and held a hearing to address the interpretation concerns. The court reswore and questioned the court interpreters, and neither thought there were any apparent issues with their own or the other's interpretation. The court also heard from the Judiciary's Language Access Program's manager, who testified that she separately spoke with the interpreters and confirmed that each had been listening to the other's interpretation and noted no concerns.

¶ 101. Neither defendant nor his counsel alleged that defendant was not understanding the proceedings due to the interpretation being provided to him. Because defense counsel argued that the quality of interpretation was "an objective standard," where "how well [defendant] does or does not understand" was irrelevant, counsel did not make any proffer[11] or introduce any testimony to show that defendant was not meaningfully understanding the proceedings or was unable to participate in his own defense.

¶ 102. Given the lack of argument about how any defect in the interpretation impacted defendant's understanding and participation, the trial court's response to defendant's motion to ensure adequate interpretation for defendant was not an abuse of discretion. See State v. Casipe, 686 P.2d 28, 34 (Haw. Ct. App. 1984) (holding trial court did not abuse its discretion denying defendant's motions for mistrial based on claimed issues with interpreter because defendant and his attorney "were furnished the means by which [d]efendant could be fully apprised with knowledge of the proceedings and the course of the testimony"); see also Lee, 134 N.E.3d at 535 (concluding trial court did not abuse its discretion in overseeing interpretation because trial court reasonably concluded that defendant understood interpretation after answering more than six-

---

[11] Though defendant now asserts that the court declined to hear a proffer from defendant, the record does not support that claim. The court did decline to hear from defendant before the jury was to be called in when the oral motion for "competent interpreters" was made on the morning of trial. However, defendant's written submission of his motion later that day included a detailed proffer from the defense interpreter and no information at all about defendant's understanding. Defendant's written post-trial motion for an evidentiary hearing similarly did not include any allegations that would tend to show that he had any difficulty understanding the interpretation being provided to him.

hundred interpreted questions). In light of the arguments presented to the trial court, we conclude that the court made a reasonable inquiry into the quality of the interpretation and took reasonable steps to ensure that the interpreters were providing competent interpretation.

## C. Post-Trial Motion

¶ 103. After trial, defendant moved for an evidentiary hearing to establish a record to show errors in the asserted interpretation. The court denied the motion because defendant did not "represent[] that the alleged inaccuracies in interpretation had any impact on" defendant. Accordingly, it concluded that defendant "failed to raise . . . a genuine issue of material fact as to whether any issue with the interpretation services provided made his trial fundamentally unfair."

¶ 104. We review a trial court's denial of an evidentiary hearing for abuse of discretion. V.R.Cr.P. 47(b)(2) (stating decision whether to hold oral argument on motion is in discretion of trial court); State v. Senecal, 145 Vt. 554, 560-61, 497 A.2d 349, 352 (1985). A hearing on a motion is not required "unless the motion papers indicate a real dispute for one or more relevant facts." State v. Grenier, 2014 VT 121, ¶ 12, 198 Vt. 55, 110 A.3d 291 (quotation omitted).

¶ 105. Because defendant did not raise any issue with his own understanding of the proceedings due to the interpretation provided to him, the trial court did not abuse its discretion in denying defendant's request for an evidentiary hearing. As discussed above, the right to an interpreter exists to protect a defendant's understanding and capacity to assist in his own defense. As the trial court noted in its denial of the motion, defendant alone was uniquely positioned to alert the court to any confusion or misunderstanding of the proceedings caused by the interpretation. Having failed to allege how his right to a fair trial was affected, the court acted within its discretion in denying defendant's request for an evidentiary hearing.

## D. Recording of Interpretation

¶ 106. Defendant also contends that the trial court abused its discretion in denying his request to create a formal court record of the interpretation provided to defendant. Defendant has

not provided any federal or state law recognizing a constitutional right to a recording of any interpretation provided to a defendant. In fact, to the extent that it has been addressed, other courts have indicated that an audio recording of interpretation is not a requirement. See, e.g., In re Pheth, 502 P.3d 920, 925 (Wash. Ct. App. 2021) ("No statutes or case law support [defendant's] view that an audible audio recording of court proceedings including all statements made to and from interpreters . . . is routinely required."); People v. Braley, 879 P.2d 410, 413 (Colo. App. 1993) (explaining that recording of non-English testimony is not "necessary to ensure a reliable translation"); United States v. Hernandez, No. 89-7725, 1990 WL 125519, at *7 (4th Cir. Sept. 19, 1990) (per curium) (rejecting defendant's arguments that recording of interpretation was necessary where defendant neither raised "specific allegations of statements incorrectly translated" nor "demonstrated how he was prejudiced").

¶ 107. At trial and on appeal, defendant relies on the Vermont Judiciary's Language Access Manual. The Manual provides that:

> Judges should ensure that recordings are made of all interpreted proceedings. The record of the case made by a court reporter in interpreted proceedings consists only of the English language spoken in court. (Obviously a court reporter cannot preserve any of the non-English language for review.) The judge should ensure that the recordings capture both the English and the non-English speaker (in the case of [Video Remote Interpreting] or a deaf or hard of hearing party or witness) so that any language issues can be properly raised and reviewed on appeal. Proceedings interpreting in the simultaneous mode is done quietly at counsel table or with interpreting equipment and requires special arrangements for recording. This may require advance planning.

Though the Manual also acknowledges that "the primary record of the proceedings is only in English, and it is the recorded English testimony that constitutes evidence in the case," it also states that "the non-English interpretation should be captured on the audio or video recording so that any potential interpreting errors that may affect the outcome can be reviewed on appeal."[12]

_____

[12] The reason the Manual instructs courts to create a record of the interpretation provided is to allow further review later. Despite the Manual stating that "interpreting errors . . . can be

¶ 108. Defendant asserts that the trial judge's failure to create a formal court record of the interpretation being provided to defendant, per the Manual, amounts to an abuse of discretion. We agree that better practice would be to have the court record the interpretation. Such a practice would avoid any later disputes about the veracity or completeness of a recording taken by a defendant. But the trial court's decision not to create a formal court record of the interpretation alone does not demonstrate an abuse of discretion.

¶ 109. To show an abuse of discretion here, defendant must show that his trial was fundamentally unfair due to the lack of a court record of the interpretation. See Valladares, 871 F.2d at 1566; V.R.Cr.P. 28 (requiring trial court to provide "competent interpreter services" as "necessary to ensure meaningful access" to trial). We see no such unfairness here. The trial court took numerous measures to ensure that defendant could meaningfully participate in his trial. At defendant's request, the court had two interpreters working throughout the trial to "combat fatigue and allow[] the resting interpreter to monitor the interpretation for errors or misunderstandings," provided simultaneous interpretation through a headset for defendant, allowed the defense interpreter to listen to the interpretation being provided to defendant as an "added precaution" to provide more "security as to the legitimacy of the interpretation," and ultimately allowed defense counsel to record the interpretation.

¶ 110. When defendant raised a specific issue of accuracy of the interpretation, the court addressed it promptly. When defendant raised a general issue with the accuracy, the court inquired with the court interpreters and reminded them of their oath to accurately and completely interpret

---

reviewed on appeal," it is unclear how this Court could review any recording of a non-English interpretation in any meaningful way on direct appeal absent a concurrent objection by defendant and adequate record in the trial court. Any such claim of error would require expert testimony to evaluate the accuracy of the interpreted material. Without trial court findings to create that factual record, these types of issues are not appropriate for direct appeal. Unless a claim of error "is raised at trial and ruled on by the court . . . there are no findings on the question and no record on which this Court can determine if a trial judge erred." State v. Judkins, 161 Vt. 593, 594-95, 641 A.2d 350, 352 (1993) (mem.).

the proceedings. And the record reflects that counsel took recordings of the interpretation and used them as a basis for defendant's post-trial motion discussed above. Given this record and the lack of any argument that defendant's right to participate in his trial was impaired by a lack of a court recording of interpretation, we conclude that the trial court did not abuse its discretion.

## E. Plain Error

¶ 111. Defendant also argues that the court committed plain error in its overall handling of his challenges to the interpretation. For an error to rise to the level of plain error, defendant must show that "the error affects substantial rights and results in prejudice to the defendant." State v. Waters, 2013 VT 109, ¶ 16, 195 Vt. 233, 87 A.3d 512. Defendant cannot establish prejudice because he did not argue—either below or on appeal—that the trial was fundamentally unfair because of the interpretation provided to him. See Valladares, 871 F.2d at 1566. Thus, defendant cannot establish that, even if there were errors in the interpretation provided to him, that the errors amounted to plain error. It is defendant's burden to show that any deficiencies in interpretation deprived him of a fair trial. Lacking such a showing, the trial court did not commit plain error in its approach to overseeing the interpretation provided to defendant.

## VII. Conclusion

¶ 112. Defendant finally argues that the cumulative impact of all the alleged errors amounts to a denial of due process and a fair trial. Because we have concluded there are no prejudicial errors presented, there is no basis for such a conclusion. See State v. Desautels, 2006 VT 84, ¶ 29, 180 Vt. 189, 908 A.2d 463. We thus affirm defendant's convictions.

Affirmed.

FOR THE COURT:

_____

Associate Justice

37